## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | |
|---|---|
| **SHNYAR ANWAR HASSAN** | |
| | |
| **Plaintiff,** | |
| | **Civil Action No. 1:22-cv-1288** |
| **v.** | |
| | |
| **MASROUR BARZANI** | **JURY TRIAL DEMAND** |
| | |
| | |
| **Defendant.** | |
| | |

## COMPLAINT

Plaintiff Shnyar Anwar Hassan, by and through her undersigned attorneys, hereby alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for the damages inflicted on Plaintiff Shnyar Anwar Hassan ("SHNYAR") by Defendant Masrour Barzani ("MASROUR") by means of his malicious and defamatory threats and incitements of violence against her.

2.      MASROUR libeled and defamed SHNYAR with the intention of inciting persons to do bodily harm to her in Northern Virginia, and other places, by publishing and encouraging the publication of scurrilous and fabricated accusations that she had an adulterous affair with an American reporter, Zack Kopplin ("Kopplin"), who exposed MASROUR's extensive corruption and the concealment of proceeds of that corruption in the United States, including the Eastern District of Virginia.

3.      MASROUR took these outrageous actions in retaliation against SHNYAR for her public dissemination of information concerning his transgressions against the people of Kurdistan,

1

including her translation and online posting of a December 2021 article by Kopplin in *The American Prospect.*

4.       MASROUR knew and intended that his false and defamatory statements would irreparably damage SHNYAR's reputation and incite religious extremists, and his supporters, to cause her harm in Northern Virginia and elsewhere. Upon learning of MASROUR's actions, *Kurdistan Watch*[1] issued an online warning that: "Accusations of infidelity of a married woman - in a deeply conservative society like Kurdistan's - isn't only a character assassination but a direct call for the killing of the said woman."

5.       Fortunately, as of the date of the filing of this Complaint, MASROUR has been unsuccessful in his efforts to cause her physical harm. Nonetheless, he has severely traumatized SHNYAR and her husband, Sarkawt Shamsulddin ("Sarkawt"), damaged their relationships with family and friends, disrupted their livelihoods and occupations, and caused them to live in a perpetual state of fear that someone may answer MASROUR's call for violence.

## JURISDICTION AND VENUE

6.       This Court has jurisdiction over this action under 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and is between a citizen of the Commonwealth of Virginia and a citizen or subject of a foreign state. Plaintiff is a citizen of, and domiciled in, the Commonwealth of Virginia. The Defendant is not a citizen of, or domiciled in, Virginia.

---

[1]/    *See*   https://twitter.com/KurdistanWatch/status/1468959990794784776.   *Kurdistan Watch* monitors human rights and freedom of expression in the Kurdistan Region of Iraq. It reports on human rights, violence against women, violence and detention of journalists, arbitrary arrest of activists and political opponents, minorities. https://kurdistan. substack.com/about

7.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391, since a substantial part of the events or omissions giving rise to the claim occurred here and the Defendant is not a resident of the United States.

## PARTIES

8.     Plaintiff SHNYAR is a U.S. citizen domiciled in Manassas, Virginia, in the Eastern District of Virginia, where she resides with her husband Sarkawt Shamsulddin, who served as an elected Member of Parliament in Iraq from 2018 to 2021. SHNYAR is an advocate for women's rights in Kurdistan, Iraq, and worked with local and international Non-Governmental Organizations ("NGOs") to fight against domestic violence and corruption in Kurdistan before moving to the United States in 2017. SHNYAR is continuing her work on these important issues from her residence in Virginia.

9.     Defendant MASROUR is the Prime Minister of Kurdistan, an autonomous region in the country of Iraq. He graduated from the American University in Washington, D.C., in 1997 with a degree in international relations and regularly visits and stays in the United States and Northern Virginia. Upon information and belief, MASROUR holds a "green card" and is a permanent U.S. resident. MASROUR took the actions against SHNYAR, as alleged in this Complaint, in his personal capacity and for reasons that are unrelated to his position with the Kurdish Regional Government ("KRG").

10.     Upon further information and belief, MASROUR, together with his wife and other family members, owns a large mansion in McLean, Virginia, in the Eastern District of Virginia, that has a market value of more than $10 million, which he visits when he is in the United States. He reportedly also owns a commercial building in Miami, Florida, worth more than $18 million.

MASROUR owns these and other U.S. properties through nominees to conceal his actual ownership of the properties.

## FACTUAL ALLEGATIONS

### A.    KURDISH KLEPTOCRACY AND SUPPRESSION OF THE PRESS

11.    MASROUR and his immediate family and relatives (the "Barzanis") have long enjoyed the riches and trappings of power they have amassed to themselves as a leading clan in Kurdistan.[2] Members of the Barzani family reportedly control a large number of commercial enterprises in Kurdistan, with a gross value of several billion dollars.

12.    Numerous journalists have reported that MASROUR and the Barzanis have enriched themselves through bribes and corrupt government contracts and by exporting from Kurdistan the proceeds of their corruption and investing their ill-gotten gains in secure investments in the United States and elsewhere. According to these reports, following the well-established playbook of kleptocrats[3] everywhere, MASROUR and the Barzanis use nominees and shell companies to hold title to assets they acquired with the proceeds from their misdeeds.

---

[2] On September 6, 2022, *Ekurd Daily* reported that less than four years after paying $27 million for a house in Beverly Hills, the Barzanis are putting one of their two Beverly Hills mansions up for sale for $30 million. According to the article, the mansion has 21,000 square feet of living space, 8 bedrooms, 16 bathrooms, and its own bowling alley. *See* James McClain, *Barzani family selling Beverly Hills mansion with a bowling alley for $30 million*, EKURD DAILY (Sep. 6, 2022), https://ekurd.net/barzani-family-selling-beverly-2022-09-06.

[3] "When government officials abuse public power for private gain, they do more than simply appropriate illicit wealth. Corruption robs citizens of equal access to vital services, denying the right to quality health care, public safety, and education. … As a fundamental threat to the rule of law, corruption hollows out institutions, corrodes public trust, and fuels popular cynicism toward effective, and accountable governance." *See* The White House, *Fact Sheet: United States Strategy on Countering Corruption* (Dec. 6, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/06/fact-sheet-u-s-strategy-on-countering-corruption/. The United States Agency for International Development ("USAID") is devoting substantial resources

13.     The Barzanis' extensive corruption has for many years attracted the attention of journalists and human rights activists. Numerous news articles have described the assets controlled by the Barzanis in the United States and other countries through nominees and cut-outs. Journalists also have written about the Barzanis' corruption closer to home in Kurdistan.

14.     To conceal their corruption and silence their critics, according to evidence provided by human rights organizations, MASROUR and the Barzanis have threatened journalists and activists and caused them to be imprisoned and, in some cases, killed. For example, in December 2005, journalist Kamal Qadir was arrested in Kurdistan in response to a series of articles criticizing the Barzani family. He was charged with defamation and sentenced to thirty years' imprisonment. He was only released following international pressure from Amnesty International, Reporters Without Borders, and the government of Austria (of which he was a citizen).

15.     Another often-cited example of the Barzanis' silencing of journalists is the case of Sardasht Osman, a young Kurdish writer who published articles in *The Kurdistan Post,* an opposition platform based in Europe, that were critical of the rampant corruption of the Barzani family and the political party and entities they control. Osman authored an article in December 2009 entitled *"I Love Barzani's daughter,"* which juxtaposed the Barzanis' luxurious lifestyle with the hardships of average Kurdish citizens. In the article, Osman satirically claimed that he desired to marry into the family so that he could share in the vast wealth they enjoy.

16.     This pointed criticism of the Barzani family provoked a backlash. Threatening and insulting emails began arriving in Osman's email account, demanding that he reveal his identity

---

to dismantling kleptocracy globally. *See* U.S. Agency for International Development, *Dekleptification Guide: Seizing Windows of Opportunity to Dismantle Kleptocracy* (Sep. 7, 2022), https://www.usaid.gov/anti-corruption/dekleptification.

and publish a photograph so he could be identified. Undaunted, Osman subsequently published a photograph, along with his next satirical article, entitled *"Neither The President Nor His Daughter,"* and he immediately began receiving death threats.

17.     On May 3, 2010, four armed men abducted Osman from the Salahuddin University campus where he was in his final year of studies. They drove him to Mosul through several checkpoints manned by security personnel controlled by the Barzanis. Two days later, Osman's body was found dumped in a Mosul neighborhood, with hands and feet tied and two bullets lodged in the back of his head. No official blame was ever assigned for the murder, but it fit the general pattern of threats and murders against journalists in Iraqi Kurdistan, which are widely believed to be carried out by persons associated with the Barzani clan.

18.     According to a recent investigative report conducted by several international organizations, and reported by Voice of America, the Barzanis were involved in Osman's tragic death.[4] The *Kurdistan Post* also accused KRG President, Masoud Barzani (MASROUR's father), and the Parastin – the Kurdish Democratic Party's ("KDP") security and intelligence arm commanded by MASROUR – of carrying out the killing in retaliation for Osman's satirical articles.

---

[4] Committee to Protect Journalists, *Anniversary of Kurdish journalist murder sends out alarming truth about silencing of dissent in Iraqi Kurdistan* (May 4, 2022), https://cpj.org/2022/05/anniversary-of-kurdish-journalist-murder-sends-out-alarming-truth-about-silencing-of-dissent-in-iraqi-kurdistan/.

19.     The Committee to Protect Journalists has reported that, since Osman's 2010 murder, at least 22 journalists have been killed in Iraq in connection with their work, eight of whom were killed in the Kurdistan Region of Iraq.[5]

20.     Michael Rubin, currently a resident scholar at the American Enterprise Institute in Washington, D.C., and a former official in the U.S. Department of Defense and political advisor to the Coalition Provisional Authority in Iraq, is a long-time observer of Iraqi Kurdistan. In his capacity as a U.S. official, and while working as a visiting lecturer at universities in Sulaymaniyah, Salahuddin (in Erbil), and Duhok (in Iraqi Kurdistan), Rubin has had numerous personal contacts with various members of the Barzani family. He has frequently written commentaries and articles about the corruption and self-dealing inherent in Kurdistan.

21.     In January 2015, writing in the online *Commentary* magazine, Rubin discussed the Barzani family's power struggle as MASROUR and his cousin, Nechirvan Barzani, vied with one another to succeed Masoud Barzani as the leader of the KDP. In the article, Rubin noted:

> Simply put, today, Iraqi Kurdistan is a dictatorship. . . . Masud Barzani is president and lives in a palace complex in a resort inherited from Saddam Hussein. His nephew, Nechirvan Barzani, is prime minister. His uncle, Hoshyar Zebari, was Iraq's foreign minister and is now finance minister. Masud's eldest son, **MASROUR** Barzani, leads the intelligence service; and his second son Mansour is a general, as is Masud's brother Wajy. Barzani's nephew Sirwan owns the regional cell phone company which, while purchased with public money, remains a private holding. **Barzani's sons are frequently in Washington D.C. They have their wives give birth in Sibley Hospital in order to ensure the next generation has American citizenship, and MASROUR Barzani acquired an $11 million mansion in McLean, Virginia.**

---

[5] "The case of Sardasht [Osman] is illustrative of the fate of many young, critical journalists in Iraqi Kurdistan, including: Asos Hardi, Kawa Garmyani, Wedad Hussein and Soran Mama Hama. Since Sarshadt's murder, at least 22 journalists have been killed in Iraq in connection to their work, eight of whom were killed in the Kurdistan Region of Iraq." *Id.*

Michael Rubin, *Be Very Worried About Barzani Family Power Struggle*, COMMENTARY (Jan. 18,

2015) (emphasis added), https://www.commentary.org/michael-rubin/worried-barzani-family-

power-struggle/. The article went on to note:

> The result of the power struggle matters. Both Nechirvan and
> **MASROUR** Barzani would be corrupt by any American standard.
> Certainly, that's a more difficult call by Iraqi and Kurdish law which
> doesn't define business and political conflicts of interest in the same
> way. Still, both the Barzanis (and Talabanis) confuse personal,
> party, and public funds.

(Emphasis provided).

22.     The activities of Kurdish authorities in curtailing press freedoms and oppressing

journalists and rights activists have attracted the attention of international organizations beyond

the watchdog organizations that focus exclusively on the suppression of journalists and the press.

23.     In May 2021, the United Nations accused Kurdish authorities of intimidating and

arbitrarily detaining journalists and activists. *See* Iraq: New UN report shines light on 'deeply

worrying' pattern of restrictions in Kurdistna, UN NEWS (May 12, 2021),

https://news.un.org/en/story/2021/05/1091832. The joint report, authored by the U.N.'s Iraq

mission and the office of its High Commissioner for Human Rights, came a week after an appeals

court upheld six-year jail sentences for five journalists and activists, based on a trial held in Erbil

that had been criticized by NGOs and human rights groups.

24.     The U.N. report noted, "Over the past year, journalists, human rights activists and

protesters who questioned or criticized actions by the Kurdistan regional authorities have faced

intimidation, threats and harassment, as well as arbitrary arrest and detention." The report said 33

journalists, activists or human rights defenders were arrested without being given a reason, denied

access to lawyers, or held without their families being told. The report further stated that: "[i]n at

least five documented cases, journalists and human rights defenders have been charged, released

8

on bail, then immediately rearrested on different charges, leading to concerns that the legal system is being 'instrumentalized,'" to pressure them into self-censorship.

25.     One of the men referred to in the U.N. report who was convicted in the Erbil trial, journalist Sherwan Sherwani, was known for his investigations into corruption and, before his arrest, had criticized MASROUR on Facebook. According to news accounts, many activists believed that MASROUR is responsible for the security crackdown on journalists and rights activists. A week before the trial, MASROUR reportedly stated that the detainees were "neither activists nor journalists," but "spies" and "saboteurs." Later, the court repeated MASROUR's statement and sentenced the activists to four years each in prison.

## B.      ZACK KOPPLIN'S ARTICLES: BARZANI CORRUPTION

26.     Zack Kopplin is an American investigative journalist currently with the *Government Accountability Project* whose articles on various topics have appeared in *The Washington Post, The Daily Beast, The New Republic, Huffington Post, The Guardian,* and *The American Prospect.* Beginning more than four years ago, Kopplin has reported on corrupt government contracts and illegal bribes and payoffs by U.S. and other western countries' government contractors operating in Iraq. More recently, he began to investigate and document the Barzanis' corruption and hidden wealth inside and outside Kurdistan, which he exposed through articles published by various news outlets.

### *FEBRUARY 2019 ARTICLE*

27.     In February 2019, in an article published by *The Daily Beast* entitled "DOJ Is Investigating Whether U.S. Payoffs to Iraqi Officials Opened the Door for ISIS," Kopplin and co-author Irvin McCullough described a U.S. Department of Justice investigation into potential Foreign Corrupt Practices Act violations and bribery of Iraq government officials in order to secure

9

lucrative U.S. government contracts at the Balad Air Base, a large F-16 base north of Baghdad, Iraq, which, though owned by Iraq, is funded by the U.S. government. The next month, the company at the center of the article withdrew from its planned initial public offering.

*JULY 2020 ARTICLE*

28.     In July 2020, Kopplin published an article in *The New Republic* entitled "How Taxpayer Dollars May Have Bought a Kurdish Strongman's Beverly Hills Mansions." This was his first article focusing on the Barzani family and followed an earlier investigative piece in which he outlined "how Kurdish and American firms used shell companies with connections to the Patriotic Union of Kurdistan ["PUK"], one of the region's two major political parties, to dominate fuel sales to the U.S. military and inflate prices." The July article notes "PUK-aligned groups aren't the only ones cashing in on these American fuel purchases: A tangled network of corruption illustrates how ostensible rivals can cooperate to rip off the Defense Department."

29.     In the July 2020 article, Kopplin alleged that the Barzanis also fleeced the U.S. government by over-charging for fuel deliveries to the U.S. military in Iraq. The article described Masoud Barzani (MASROUR's father) and his family as "a clan of American-sponsored kleptocrats" who have, among other things, profited from using shell companies to contract with and exclusively sell fuel to U.S. bases in Kurdistan.

30.     In his article, Kopplin described a series of multi-million-dollar real estate assets purchased in Beverly Hills, California; McLean, Virginia; and London, England; ostensibly by nominees and cronies of the Barzanis on their behalf. All the purchases are described as taking place behind the shield of shell companies whose beneficial ownership is undisclosed. In the case of the McLean, Virginia mansion, Kopplin stated that Virginia real estate records show that the

nominal owner, Apeks LLC, is managed by Sarwar Pedawi, a Kurd and close associate of MASROUR.

31.     Kopplin's July 2020 article also cited the "Paradise Papers" leaked compilation of confidential financial records, which showed that Sarwar Pedawi is an officer of Ster Group International (along with his son, Laween Pedawi). https://offshoreleaks.icij.org/nodes /80111299. A leaked December 28, 2008, U.S. Department of State cable claimed that Ster Group International is widely known to be majority-owned by MASROUR. *See* https://wikileaks.org/ plusd/cables/08BAGHDAD4042_a.html.

32.     Kopplin reported that the U.S. government had initiated criminal investigations into the corrupt fuel sales to the U.S. military but acknowledged that it can be difficult to prove the real beneficiaries of such frauds, in particular when the entities used to further the frauds are formed under U.S. corporate laws that do not require disclosure of actual owners.

33.     One of the companies referenced in the July 2020 Kopplin article is Repeat Consultants International, the Kurdish branch of a Virginia technology company partially owned by Haval Dosky and listed as an approved vendor at the Erbil airport. The article reported that, according to Abdulla Hawez, a Kurdish journalist and researcher, Dosky ". . . is widely believed to run 'quite a bit' of the Barzani family business, . . . ." Another source close to the Barzani family identified Dosky as a friend and employee of Mansour Barzani (MASROUR's brother, Masoud Barzani's son, and Nechirvan Barzani's cousin). In 2018, Dosky made headlines in the U.S. when it was discovered that he had used shell companies to facilitate the purchase of two Beverly Hills mansions for the Barzanis.

34.     While writing his July 2020 article, Kopplin contacted opposition politician, Sarkawt Shamsulddin – SHNYAR's husband. At the time, Sarkawt was a Kurdish opposition

11

politician with the New Generation Movement based in Sulaymaniyah, Kurdistan, Iraq. In Kopplin's article, Sarkawt questioned whether Dosky used secret assets hidden in anonymous shell companies to buy the properties. Repeat Consultants International "is supposed to be an I.T. consultancy," Sarkawt said, but he believed it unlikely that profits from the I.T. company would suffice to cover the cost of some of the most expensive properties in Beverly Hills.

35.    Dosky, through his lawyers, claimed that Repeat Consultants International "does not have any contracts, either prime or sub, with any entity for providing fuel in Kurdistan to the United States Government." Kopplin's article noted that "Dosky's hiring of [a Washington, D.C. law firm] was itself an audacious move: Their firm is registered under the Foreign Agent Registration Act as lobbyists for the KDP, which paid it over $300,000 to advocate for military and financial support from the U.S. government." Although his lawyers also denied that he owned any real estate in California, soon after Kopplin sent requests for comment, "Dosky took active steps to obscure his relationships. Several of his social media accounts, which contained pictures of him with members of the Barzani family, were recently deleted."

36.    Kopplin's outreach to Sarkawt for the July 2020 article was the first time he had spoken with Sarkawt. As of the date of the filing of this Complaint, Kopplin and SHNYAR have never met in person. They had not even spoken until after Kopplin published another article in December 2021.

### DECEMBER 2021 ARTICLE

37.    On December 7, 2021, Kopplin published an article in *The American Prospect* entitled "Cowboy Drugstore: Traces of a kleptocrat from Iraq to Delaware to Miami."[6] The article

---

[6] https://prospect.org/power/cowboy-drugstore-traces-of-a-kleptocrat/.

described how MASROUR and the Barzanis use real estate and other investments held through shell corporations controlled by cronies outside Iraq to conceal huge sums of money. Working from publicly available documents, Kopplin described how he had pieced together MASROUR's ownership of commercial real estate in Miami, Florida, leased to a CVS store, and which was purchased in 2019 for $18.3 million.

38.     Press reports had initially linked Virginia real estate company KNLB to the purchase, because some of the transactional documents identified the company as purchaser, but KNLB issued a statement disclaiming that it was the owner or, indeed, that it had had anything to do with the transaction. Kopplin uncovered that "[t]he actual purchase was made by an anonymous Delaware shell company. Buried in incorporation documents for this Delaware company's Florida branch is the name of the building's real owner: MASROUR Barzani, the prime minister of Iraqi Kurdistan." (Emphasis added).

39.     In his article, Kopplin noted a real estate investment in Kurdistan that is owned by a company "secretly connected" to one of MASROUR's brothers, has been valued at $1.27 billion. According to Kopplin, the ability to secretly own entities in the United States has enabled kleptocrats, including the Barzanis, to hide illicit funds in investments all over the United States.

> The Barzanis have enough secret property, which also includes mansions in California and Virginia, that they've now been caught hiding money in America four times. Collectively, the family has paid over $75 million for these four properties alone. These investments likely represent only a small fraction of the family's secret wealth in the United States. None of these properties were discovered through a Panama Papers–style leak. Instead, all four properties, which had proxy owners and expensive law firms to protect them, were only unmasked because their agents made small slipups.

40.     In the case of the $18.3 million CVS property in Miami, a law firm retained by the Barzanis registered three Florida companies and one Delaware company, all named after the

13

property's street address in Miami, "983 Washington." The paperwork included the names and signatures of MASROUR and one of his other brothers, Muksi Barzani. Kopplin identified links to the filed documents showing MASROUR's name as the "Authorized Member" for the LLC in one filing and Muksi Barzani's name listed as an LLC "Member" in another document. Under the applicable Florida and Delaware statutes, LLC members are the owners of the LLC.

41.     Kopplin found that, soon after the $18.3 million purchase, the Barzanis' law firm took steps to remove the Barzanis' names from the filed documents and replaced them with the name of the Barzanis' attorney. Kopplin noted, "It wasn't a perfect solution, but this legal triage was highly effective. You won't find their names in popular corporation research databases, and it was enough to fool local journalists." Kopplin then noted that the law firm took significant steps to defend its wealthy clients:

> When called for comment, [the Barzanis' attorney] categorically denied that the Barzanis owned the building or were clients of [the law firm]. Instead, he said the corporate documents held by the Florida secretary of state were incorrect. (Later, in response to follow-up questions, [the Barzanis' attorney] denied saying any of the things that he had previously said. "If you choose to write an article about the Barzani family, your characterization of my response to you must be '[the Barzanis' attorney] would not comment on these matters,'" he wrote in an email.)

(Omissions added). A similar "slip-up" had exposed the actual ownership of the McLean, Virginia mansion that Kopplin had written about in July 2020.

42.     This veil of secrecy makes it difficult to trace the actual ownership and hidden investments by foreign kleptocrats in the United States. Kopplin noted that, while the recently enacted Corporate Transparency Act will require many companies to record beneficial ownership with the Treasury Department's Financial Crimes Enforcement Network ("FinCEN"), there are major exceptions to the requirement that render the law inadequate:

> Providing law enforcement access to ownership records is a step in the right direction, but still inadequate. This ties the ability to effectively investigate corporate malfeasance to the priorities, resources, and legal handicaps of the Department of Justice. Federal investigators will probably be far more effective at catching terrorist financiers and drug smugglers, but anyone who doesn't threaten national security, like the Barzanis, who are close American military allies, will likely be far less of a priority.

43.     Kopplin suggested that a public beneficial ownership registry was the only adequate reform but also noted that, even with such a registry:

> One often illegal service provided by companies in the secrecy industry is nominee ownership. This means that the company provides a fake owner, not just a lawyer or agent, to sign corporate paperwork. The real owner is protected by legal documents, like undated letters of resignation signed by the fake owner and a power of attorney that lets them dictate corporate decisions, all while remaining hidden from the public and law enforcement.

44.     The online version of Kopplin's December 2021 article contains the following text at the end of the article:

> 12/9/21 UPDATE: Kurdish Prime Minister MASROUR Barzani denied the allegations in this article and accused the reporter of having an affair with a Kurdish activist. The reporter has never met this activist, and the documents referenced are from Florida government websites.

(Emphasis added).

45.     The updated notice was made necessary because of MASROUR's actions against SHNYAR, as further described below.

## C.    SHNYAR'S PUBLIC OPPOSITION TO MASROUR'S CORRUPTION

46.     For some time, SHNYAR and Sarkawt have been critical of MASROUR's corruption and that of the Barzani clan. SHNYAR worked as an activist for women's rights with several local Iraqi and international NGOs, addressing domestic violence, human rights, and

corruption in Kurdistan, before she moved to the United States in 2017. Sarkawt used his political platform as a Member of Parliament to publicly expose these issues.

47.     From the United States, SHNYAR continued her work, using her social media platform, providing interviews, and writing articles speaking out on these issues concerning women and activists and journalists in Iraq and, specifically, Kurdistan.

48.     SHNYAR has been a frequent target of the Barzanis. When she posts messages online, individuals on Barzani-affiliated Facebook and other social media pages threaten her, including with physical attack in the United States. SHNYAR and Sarkawt have been told by friends and family in Kurdistan that the Barzanis plan to harm them both. Although they have brought these issues to the attention of U.S. authorities, the online harassment and threats to their physical safety have continued.

49.     In May 2020, SHNYAR posted a video on Facebook in which she stated that she would expose the Barzanis' corruption in the U.S. and not be intimidated by cyberbullying. She then received information about the Barzanis' business with the U.S. government, including several Department of Defense contracts.

50.     In the fall of 2020, SHNYAR learned that Haval Dosky's (Dosky is the Barzani associate mentioned in Kopplin's July 2020 article) house in Fairfax, Virginia, had been raided by the FBI.

51.     SHNYAR provided interviews to Kurdish news outlets in which she discussed the Barzanis' corruption and people close to the Barzanis in the United States who might be helping hide their ill-gotten assets.

**D.      DEFENDANT'S DEFAMATORY THREATS AGAINST SHNYAR**

52.      The Barzanis and the KDP control multiple news sources in Kurdistan. MASROUR controls *Kurdistan 24* (*"K24"*) and Nechirvan Barzani controls *Rudaw*. Both news outlets have television channels, online news reporting, and other social media accounts through which the Barzanis and the KDP publicly disseminate information in Kurdistan and globally. In addition to these news sources, the Barzanis and the KDP also control a large array of social media accounts and robot networks (also known as "botnets," which are a network of computers infected by malware that are under the control of a single attacking party) to amplify their messaging.

53.      Kurds living in Northern Virginia receive news about Kurdistan in Kurdish language through the news sources controlled by MASROUR, Nechirvan Barzani, and the KDP. The KDP makes special efforts to ensure that expatriate Kurds in Northern Virginia can access these sites via a device called "iStar" that enables anyone with an internet connection to directly view *Rudaw* and *K24* programming from anywhere with internet access. This device can be easily obtained online or through Halal stores in Virginia and elsewhere in the U.S.

54.      On December 7, 2021, Zack Kopplin published his article in *The American Prospect* about the CVS property in Miami, Florida, which Kopplin alleged is owned by MASROUR. SHNYAR and Sarkawt re-posted links to the story on Twitter and Facebook and translated the article into Kurdish, so people in Kurdistan and the local Kurdish community in Northern Virginia could understand what MASROUR was doing in the U.S. They also demanded an explanation from MASROUR about the source of the money he used to buy the Miami property. The story led to public outrage about MASROUR and the Barzanis in Kurdistan and elsewhere.

55.      On December 9, 2021, several news outlets in Kurdistan, including *Rudaw* (both online and in its on-air TV broadcast), *Kurdistan TV* (the KDP's official mouthpiece), and *K24*

(on its website), reported a statement in response to Kopplin's article that was issued in Kurdish language by the Office of the Prime Minister of the KRG (MASROUR's office). The original Kurdish language version of the statement (the "Defamatory Threat") reads as follows:

<div dir="rtl">

دەقی ڕوونکردنەوەی نووسینگەی سەرۆکی حکومەتی هەرێمی کوردستان:

چەند ڕۆژێکە هەندێک سایت و پەیجی سۆشیال میدیا، بابەتی کەسێکی ئەمسریکی بڵاودەکەنەوە، کە راپۆرتێکی بێ بنەمایە لە سەر سەرۆکی حکومەتی هەرێمی کوردستان. ئەم بابەتە دوورە لە راستییەوە و هیچ بنەمایەکی بۆ نییە، لێرەدا بە پێویستی دەزانین چەند ڕوونکردنەوەیەک لە بارەی ئەم تۆمەتە بێ بنەمایە بخەینەڕوو:

نووسەری ڕاپۆرتەکە بۆ هەڵبەستنی درۆیەکانی پشتی بە کۆنتراکتێک بەستووە، کە گوایە واژووی سەرۆکی حکومەتی هەرێمی کوردستانە، بەڵام ئەم واژووە هیچ پەیوەندییەکی بە سەرۆکی حکومەتەوە نیە.

دوای بەدواداچوونمان، دەرکەوت نووسەری ڕاپۆرتەکە، پەیوەندی لە گەڵ خێزانی پەرلەمانتارێکی کوردی پێشووی عێراقەوە هەیە، کە هاووڵاتی ئەمەریکییە و بە هەڵوێستەکانی دژ بە خەڵکی کوردستان ناسراوە و بە هۆی کردەوە و هەڵوێستی خۆفرۆشانەی، لە لایەن خەڵکی نیشتمانپەروەری کوردستانەوە، سزا درا و لە دوا هەڵبژاردنی ئەنجومەنی نوێنەرانی عێراق، دەنگی پێ نەدرا و ڕیسوا کرا.

دووپاتی دەکەینەوە کە ئەم بابەتە، هەڵبەستراوە و بەشێکە لەو هەڵمەتە چەواشەکارییەی، کە دژی چاکسازییەکانی کابینەی نۆیەمی حکومەتی هەرێمی کوردستان و جەنابی سەرۆکی حکومەت دەکرێت.

نووسینگەی سەرۆکی حکومەتی هەرێمی کوردستان

09/12/2021

</div>

(Date is in DD/MM/YYYY format). The link to the K24 story, one of the several news outlets that are controlled by MASROUR and the Barzanis and which published the Defamatory Threat, is: https://www.kurdistan24.net/ckb/story/213915.

56.    The Defamatory Threat was issued at MASROUR's direction and falsely and maliciously claimed that SHNYAR and Kopplin – whose names were not included but were

immediately identifiable – were having an extramarital affair. An English translation of the Defamatory Threat is as follows:

**Rudaw Digital**

**The Office of the Kurdistan Regional Government's Prime Minister (KRG PM) has issued a statement on an American media report and asserted that "The report is unsubstantiated."**

The office of KRG PM stated that in "The last several days, a number of websites and social media pages circulated a topic of an American person—the topic is about the KRG PM. The report is far from the truth and is unsubstantiated."

The office of the PM indicated that "To validate his lies, the reporter has relied on a contract that carries the PM's signature. The signature does not belong to the PM."

After we conducted our investigation, **it became evident that the reporter has a relationship with the wife of a former Iraqi-Kurdish member of Parliament, who is an American citizen. He is known for his behavior against the people of Kurdistan;** in the last election, the people of Kurdistan punished him by not reelecting him. He lost the election in disgrace.

We reiterate that the report is fabricated and is part of a counter-campaign against the reforms that the PM and his government have undertaken.

Office of the Prime Minister
December 9, 2021

(Emphasis added). The Kurdish word (پەیوەندی) translated above as "relationship," when applied to a married woman and a man who is not her husband means in the Kurdish culture, and is understood by Kurdish speakers to mean, an "adulterous affair" outside of marriage.

57.     Kopplin's sponsoring organization, the Government Accountability Project, reacted swiftly to the Defamatory Threat, issuing a press release on December 9, 2021, which stated:

> Rather than addressing the serious allegations, **MASROUR Barzani accused our investigator of being motivated by having an affair with a Kurdish anti-corruption activist. Our investigator has never met this activist. This is a sexist and libelous attempt to distract from the Prime Minister's**

19

> **corruption.** It is also a dangerous abuse of power, coming from the office of the Prime Minister. We stand by our report, which is based on public records. Government Accountability Project **condemns the attacks on whistleblowers, activists, and journalists in Kurdistan** and condemns the financial secrecy of the Kurdish Prime Minister.

Government Accountability Project, Press Release: Government Accountability Rebuts Kurdish Prime Minister's Libel (Dec. 9, 2021) (emphasis added), https://whistleblower.org/press-release/press-release-government-accountability-rebuts-kurdish-prime-ministers-libel/.

58.     MASROUR knowingly published, or caused to be published, the Defamatory Threat to a worldwide audience on multiple occasions beginning December 9, 2021, and continuing thereafter through and by the following means: (a) the Office of the Prime Minister; (b) the websites of *Rudaw*; (c) the websites of *K24*; (d) *Kurdistan TV*; (e) *Rudaw* television; (f) *K24* television; (g) numerous social media accounts maintained by the KRG and KDP; and (h) networks of accounts and botnets linked to the KDP.

59.     MASROUR took these actions against SHNYAR to retaliate against her for her efforts to expose his corruption, and also for translating into Kurdish language and posting on the internet Kopplin's articles in *The American Prospect.*

60.     It did not take long for third party news outlets to identify SHNYAR as the "adulterous" wife of the MP described in the Defamatory Threat. For example, *The New Arab* wrote:

> The prime minister's office responded to the investigation on Thursday, calling it baseless. **It accused Kopplin of having had an affair with a Kurdish woman activist. Though the statement did not name her, it seemed to refer to SHNYAR Anwar**, the wife of a Kurdish former Iraqi parliament member Sarkawt Shams, himself an outspoken critic of Iraqi Kurdistan's ruling parties.

20

*Iraqi Kurd PM Barzani's office lashes out at graft exposé with affair claim*, THE NEW ARAB (Dec. 10, 2021) (emphasis added), https://english.alaraby.co.uk/news/pm-barzani-office-hits-out-graft-expose-affair-claim.

61.     A series of tweets posted on December 9, 2021, by the *Kurdistan Watch* Twitter account noted the sort of danger posed by MASROUR's statement:

> Kurdistan Watch strongly condemns a statement by KRG resorting to ad hominem and extremely misogynistic undertones in response to a recent report by an American journalist about a building owned by KRG PM in the US; the extent of KRG's moral decay is shocking.
>
> **Accusations of infidelity of a married woman - in a deeply conservative society like Kurdistan's - isn't only a character assassination but a direct call for the killing of the said woman.**
>
> KRG PM's office released a statement in response to a recent report by Journalist Zack Kopplin claiming the said report has a secret relationship with the wife of a former Kurdish MP in Iraq Parliament (it says all but in name the said person is outspoken activist **Shnyar** Anwar).

https://twitter.com/KurdistanWatch/status/1468959499641712645 (emphasis added). The Twitter account then posted a link to the statement by MASROUR and a statement by SHNYAR. Other persons made the connection as well and SHNYAR's social feeds and Messenger account were soon filled with threats and attempts to shame and subject her to general opprobrium.

62.     Even though Kopplin had never met SHNYAR, and his organization had said so publicly, the deluge of salacious comments and online posts continue to the present and include posts which super-imposed SHNYAR's face on photos of naked women, a post which contained a cropped photo of a male friend and SHNYAR and falsely claimed to depict Kopplin and SHNYAR together, and other claims that seek both to shame SHNYAR and support MASROUR's libelous statements. SHNYAR also has been subjected to disgusting comments, pictures, and videos, and continuous attacks through Facebook and other channels. These attacks are repeated

whenever SHNYAR comments or posts online about anything related to Kurdistan, the Barzani family, or the KDP.

63.     Since MASROUR made his Defamatory Threat, SHNYAR has received warnings that she is in danger and should cease her criticisms of MASROUR and the Barzanis. For example, on several occasions during late 2021 and in 2022, a Kurdish-American woman who resides in the Washington, D.C. metropolitan area ("Person #1") approached SHNYAR on behalf of MASROUR and the Barzanis to say that they are angry with her and that she should retract her online postings about them. Person #1 told SHNYAR that the Barzanis would financially compensate her if she would stop her public criticisms of them.

64.     On October 20, 2022, following her return from Erbil, Kurdistan, Person #1 contacted SHNYAR and requested that they meet in Tysons, Virginia. During the meeting, Person #1 told SHNYAR that she had received detailed information about Sarkawt and her and warned SHNYAR not to go back to Kurdistan. Person #1 told SHNYAR that the Barzanis are upset that she has exposed MASROUR's and the Barzanis' corruption and that they will seek revenge and possibly kill her. She said that being a U.S. citizen would not protect SHNYAR.

## E.     HISTORY AND TRADITION OF HONOR KILLINGS IN KURDISTAN

65.     "Honor killings"— the killing of women by family members or tribal relatives when they "dishonor" their families through "sexually immoral" actions—have been perpetrated on women for sex outside of marriage, even in cases of rape or assault. Kurdistan has an unfortunate and well-known history of honor killings, and its frequency has been on the rise.

66.     In Kurdistan, families often do not accept even the dead body of a girl who was killed in an honor killing, causing the government to create a separate graveyard to bury

unidentified women victimized by honor killings and rejected by their families. This has been well-documented, as noted in a relatively recent article by Julie Bindel. Julie Bindel, *'As if she had never existed': The graveyards for murdered women*, AL JAZEERA (Mar. 8, 2021), https://www.aljazeera.com/features/2021/3/8/as-if-she-had-never-existed-the-graveyards-for-murdered-women. Honor killings in Kurdistan have increased recently. *See* Ruwayda Mustafah, Policy Analysis, *Addressing Violence Against Women in Iraqi Kurdistan*, WASHINGTON INSTITUTE FOR NEAR EAST POLICY: FIKRA FORUM (Mar. 28, 2022), https://www.washingtoninstitute.org/policy-analysis/addressing-violence-against-women-iraqi-kurdistan.

67.     Honor killings are on the rise in the United States. According to a study commissioned by the Department of Justice, there are 23-27 such murders in this country every year. *See e.g.,* Hollie McKay, *Honor Killing in America: DOJ report says growing problem is hidden in stats*, FOX NEWS (May 3, 2016), https://www.foxnews.com/us/honor-killing-in-america-doj-report-says-growing-problem-is-hidden-in-stats. "To understand honor violence, one must first understand the concept of honor in cultures that use honor to justify violent behavior. Honor within these cultures is most often defined as the reputation or social standing of a family based on the behavior and morality of its female members (citation omitted). Honor violence, in general, is a mechanism to maintain or regain a family's honor by punishing or eliminating girls and women whose actions invite rumors of sexual impropriety or disobedience." *Id.*

68.     MASROUR's labeling of SHNYAR as an adulteress was a cynical and calculated act which he knew and intended would, and in fact has, placed her in imminent danger of physical bodily harm from family or other individuals in Northern Virginia and throughout the Washington, D.C., region.

69.     Since MASROUR's issuance of the Defamatory Threat, SHNYAR cannot freely socialize with friends or family, whether in Virginia or elsewhere. She cannot safely visit her family in Sulaymaniyah, Kurdistan, and lives in perpetual fear for her personal safety. The Defamatory Threat has caused Sarkawt's family to sever ties with SHNYAR and Sarkawt, and they fear that a family member or relative may respond to MASROUR's accusation by harming or even killing SHNYAR. SHNYAR's mother publicly urged MASROUR to retract the Defamatory Threat and apologize to SHNYAR, but he ignored the request.

70.     The Defamatory Threat has harmed SHNYAR, and Sarkawt as well. SHNYAR and Sarkawt had established a new business to help Iraqi investors in the United States. They had formed a company, with another partner, and had begun having discussions about the business with several potential customers. Since publication of the Defamatory Threat, potential investors and customers have refused to do business with them. This includes people in the Kurdish community in Northern Virginia and the Washington D.C. metropolitan area. Former colleagues and business associates have told SHNYAR and Sarkawt that they are concerned that doing business with them could jeopardize their relations with the Barzanis. As a result, SHNYAR and Sarkawt have been forced to resign from the company they founded.

## COUNT I

### ASSAULT: COMMUNICATION OF STATEMENTS INTENDED TO INCITE RELIGIOUS EXTREMISTS AND POLITICAL SYMPATHIZERS TO KILL OR DO BODILY HARM TO PLAINTFF

71.     Plaintiff SHNYAR hereby incorporates paragraphs 1 through 70 into this paragraph as if fully restated herein.

72.     Defendant MASROUR knowingly and intentionally assaulted Plaintiff SHNYAR by publishing and causing the publication and communication of an electronically transmitted threat that has placed her in reasonable apprehension of death or bodily harm.

73.     Defendant MASROUR's publications of the Defamatory Threat are "electronically transmitted communications" within the meaning of Va. Code Ann. § 18.2-60.3.

74.     In making his Defamatory Threat, Defendant MASROUR intended to incite religious extremists and individuals politically aligned with him to kill or do bodily harm to Plaintiff SHNYAR.

75.     Defendant MASROUR's actions would constitute a criminal violation of Va. Code Ann. § 18.2-60, which provides that "[a]ny person who knowingly communicates, in writing, including an electronically transmitted communication … a threat to kill or do bodily injury to a person … and the threat places such person in reasonable apprehension of death or bodily injury to [herself] … is guilty of a Class 6 felony."

76.     Defendant MASROUR issued the Defamatory Threat and promoted the Defamatory Threat by means of globally accessible television and internet websites and postings.

77.     Defendant MASROUR intended to transmit the Defamatory Threat to members of the Kurdish community and other individuals in Northern Virginia, where he knew and understood Plaintiff SHNYAR resides.

78.     Defendant MASROUR knew when he published, or caused to be published, the Defamatory Threat that it was maliciously false and defamatory to Plaintiff SHNYAR.

79.     The Defamatory Threat has caused, and is causing, Plaintiff SHNYAR to be in reasonable apprehension of imminent harm to her life and personal safety.

## COUNT II

### STALKING: PUBLICATION OF STATEMENTS INTENDED TO INCITE RELIGIOUS EXTREMISTS AND POLITICAL SYMPATHIZERS KNOWING THAT IT WOULD CAUSE PLAINTIFF TO BE PLACED IN REASONABLE FEAR OF DEATH OR BODILY INJURY

80.     Plaintiff SHNYAR hereby incorporates paragraphs 1 through 70 into this paragraph as if fully restated herein.

81.     Defendant MASROUR's publications of the Defamatory Threat are "electronically transmitted communications" within the meaning of Va. Code Ann. § 18.2-60.3.

82.     Defendant MASROUR directed and promoted multiple communications of the Defamatory Threat against Plaintiff SHNYAR to a worldwide audience, including individuals in Northern Virginia where he knew and understood she resides.

83.     Defendant MASROUR knew or reasonably should have known that his actions would place Plaintiff SHNYAR's life and personal safety in imminent danger from religious extremists or individuals politically aligned with him.

84.     Defendant MASROUR intended that  the Defamatory Threat would place Plaintiff SHNYAR in reasonable fear of death or bodily injury to herself, or to her family or husband.

85.     Pursuant to Va. Code Ann. § 18.2-42.3, Plaintiff SHNYAR suffered and continues to suffer damages as a result of the Defendant MASROUR's conduct in violation of Va. Code Ann. § 18.2-60.3.

## COUNT III

### DEFAMATION: PUBLICATION OF FALSE STATEMENTS INTENDED TO HARM PLAINTIFF'S REPUTATION

86.     Plaintiff SHNYAR hereby incorporates all paragraphs 1 through 70 into this paragraph as if fully restated herein.

87.     Defendant MASROUR knowingly and intentionally published or caused to be published the Defamatory Threat against Plaintiff SHNYAR to a worldwide audience, including individuals in  Northern Virginia where he knows she resides.

88.     The Defamatory Threat contained false and defamatory statements about SHNYAR which Defendant MASROUR knew were untrue when he caused them to be published.

89.     Defendant MASROUR's false and malicious statements have caused, and are causing, harm to Plaintiff SHNYAR's reputation, and they deter persons from associating or dealing with her.

90.     By publishing the false statements, Defendant MASROUR intentionally placed Plaintiff SHNYAR in immediate danger of death or serious bodily harm.

91.     As a direct and proximate result of these false statements, Plaintiff  SHNYAR has suffered damages including, among other things, injury to her reputation, harm to her ability to carry out her profession, embarrassment, humiliation, and emotional distress.

92.     Defendant MASROUR's false statements are defamatory *per se* because they falsely impute to Plaintiff SHNYAR the commission of adultery and are part of his disinformation campaign against her. Moreover, the false statements have damaged Plaintiff SHNYAR in her career. Plaintiff SHNYAR is accordingly entitled to presumed damages, as well as punitive damages.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

93.     Plaintiff SHNYAR hereby incorporates paragraphs 1 through 70 into this paragraph as if fully restated herein.

27

94.     Defendant MASROUR's actions show willful, wanton, or reckless conduct and conscious disregard for Plaintiff SHNYAR and have caused, and continue to cause, substantial adverse consequences for her.

95.     As a direct and proximate cause of Defendant MASROUR's conduct, Plaintiff SHNYAR has experienced extreme mental suffering, anguish, fright, humiliation, embarrassment, anger, and anxiety.

96.     Plaintiff SHNYAR also has experienced physical manifestations of the extreme emotional distress she has suffered as a result of Defendant MASROUR's outrageous conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Shnyar Anwar Hassan respectfully requests that the Court enter judgment in her favor and against Defendant Masrour Barzani, awarding Plaintiff:

A. Compensatory damages of not less than $25,000,000, or in such additional amount to be proven at trial;

B. Punitive damages to the maximum extent permitted by the laws of the Commonwealth of Virginia but not less than $350,000 on each count;

C. Expenses and costs, including attorneys' fees; and granting such other and further relief as the Court deems appropriate.

SECIL Law PLLC

Dated: November 14, 2022           By:   /s/ John P. Rowley III
                                        John P. Rowley III (VSB No. 19804)
                                        Adriaen M. Morse Jr. (VSB No. 38889)
                                        1701 Pennsylvania Ave., N.W., Suite 200
                                        Washington, D.C. 20006
                                        jrowley@secillaw.com
                                        (202) 417-8652
                                        amorse@secillaw.com
                                        (202) 417-8232

E & W Law, LLC


By: _____/s/ John S. Irving_____
    John S. Irving
    1455 Pennsylvania Ave., N.W., Suite 400
    Washington, D.C. 20004
    john.irving@earthandwatergroup.com
    (301) 807-5670
    *Pro Hac Vice Application Pending*

    *Counsel for Plaintiff Shnyar Anwar Hassan*