**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| **SHNYAR ANWAR HASSAN** | \| |
| | \| |
| **Plaintiff,** | \| |
| | \| |
| | \| **Civil Action No. 1:22- cv-1288-TSE** |
| **v.** | \| |
| | \| |
| **MASROUR BARZANI** | \| **JURY TRIAL DEMAND** |
| | \| |
| | \| |
| **Defendant.** | \| |
| | \| |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS AND MOTION TO STRIKE JURY**

Dated: February 24, 2023

John P. Rowley III (VSB No. 19804)
Adriaen M. Morse Jr. (VSB No. 38889)
Janet K. DeCosta*
SECIL Law PLLC
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
jrowley@secillaw.com
(202) 417-8652
amorse@secillaw.com
(202) 417-8232

John S. Irving*
E & W Law, LLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
john.irving@earthandwatergroup.com
(301) 807-5670

*Pro hac vice applications pending*

*Counsel for Plaintiff Shnyar Anwar Hassan*

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................ 1

II.     LEGAL STANDARD ............................................................................ 4

III.    ARGUMENT ...................................................................................... 6

   A.    The Complaint Properly Invokes this Court's In Personam Jurisdiction ................ 6

     1.   Virginia's Long Arm Statute ....................................................... 6

     2.   Due Process—Minimum Contacts ................................................. 9

   B.    The Complaint Properly Alleges this Court's Subject Matter Jurisdiction ........... 11

     1.   The Foreign Sovereign Immunities Act Does Not Apply Because Defendant Is Sued in his Personal Capacity ................................................... 11

     2.   Defendant Is Not Immune Under Barr v. Matteo ................................ 12

     3.   Defendant Is Not Entitled to Common Law Immunity .......................... 13

     4.   The Act of State Doctrine Does Not Bar Plaintiff's Claims ................... 16

   C.    The Kurdistan Regional Government Is Not an Indispensable Party ................... 17

   D.    Counts I-IV Are Sufficiently Pled ............................................. 18

     1.   Count III (Defamation): Plaintiff is Not a Public Figure Under New York Times v. Sullivan ...................................................................... 19

     2.   Counts I (Assault) and II (Stalking) State Actionable Causes of Action ....... 22

     3.   Count IV States an Actionable Cause of Action for Intentional Infliction of Emotional Distress ............................................................ 26

IV.    CONCLUSION .................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    140 S. Ct. 2082 (2019) ................................................................................ 18

*Alexander v. Avenue*,
    473 F.Supp.3d 551 (E.D. Va. 2020) .............................................................. 9

*Almy v. Grisham*,
    273 Va. 68; 639 S.E.2d 182 (2007) ............................................................ 26

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*,
    293 F.3d 707 (4th Cir. 2002) ...................................................................... 9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................... 5

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 ............................................................................................. 16

*Barr v. Matteo*,
    360 U.S. 564 (1959) .................................................................................. 12

*Barrett v. Catacombs Press*,
    44 F. Supp. 2d 717 (E.D. Pa.1999) ............................................................. 10

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................... 5, 5

*Blankenship v. Commonwealth*,
    71 Va. App. 608 ....................................................................................... 24

*Blue Ridge Bank v. Veribanc*,
    755 F.2d 371 (4th Cir.1985) ...................................................................... 6

*Bochan v. La Fontaine*,
    68 F. Supp. 2d 692 (E.D. Va. 1999) ........................................................... 10

*Broidy Capital Mgt. LLC v. Muzin*,
    12 F.4th 789 (D.C. Cir. 2021) .................................................................... 13

*Butters v. Vance Int'l, Inc.*,
    225 F.3d 462 (4th Cir. 2000) ..................................................................... 13

*Carter v. Commonwealth,*
    269 Va. 44; 606 S.E. 2d 839 (2005) ................................................................ 24

*Celestin v. Caribbean Air Mail, Inc.,*
    30 F.4th 133 (2d Cir. 2022) ........................................................................... 17

*Cengiz v. Salman, CV 20-3009 (JDB),*
    2022 WL 17475400 (D.D.C. Dec. 6, 2022) ..................................................... 14

*CFA Inst. v. Inst. of Chartered Fin. Analysts of India,*
    551 F.3d 285 (4th Cir. 2009) ........................................................................... 6

*Combs v. Bakker,*
    886 F.2d 673 (4th Cir.1989) ............................................................................ 6

*Conley v. Gibson,*
    355 U.S. 41 (1957) ........................................................................................... 5

*Consulting Eng'rs Corp. v. Geometric Ltd.,*
    561 F.3d 273 (4th Cir. 2009) ........................................................................... 7

*Daniczek v. Spencer,*
    156 F.Supp.3d 739 ........................................................................................ 26

*De Csepel v. Republic of Hungary,*
    27 F.4th 736 (D.C. Cir. 2022) ....................................................................... 18

*Demore v. Kim,*
    538 U.S. 510 (2003) ......................................................................................... 7

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
    637 F.3d 435 (4th Cir.2011) ........................................................................ 5, 6

*Edwards v. Fed. Govt. of Nigeria,*
    2018 WL 6619741 (D. Mass. Dec. 18, 2018) ................................................ 11

*El-Fadl v. Cent. Bank of Jordan,*
    75 F.3d 668 (D.C. Cir. 1996) ........................................................................ 15

*Etherton v. Doe,*
    268 Va. 209; 597 S.E.2d 87 (2004) ............................................................... 24

*Fitzgerald v. Penthouse Int'l, Ltd.,*
    691 F.2d 666 (4th Cir. 1983) ......................................................................... 19

ii

*Gilmore v. Jones*,
    370 F. Supp. 3d 630 (W.D. Va. 2019) ................................................................ 10

*Goodman v. Praxair, Inc.*,
    494 F.3d 458 (4th Cir.2007) ............................................................................ 5

*Hatfill v. New York Times Co.*,
    416 F.3d 320 (4th Cir. 2005) ..................................................................... 26, 27

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
    115 F.3d 1020 (D.C. Cir. 1997) ................................................................ 12, 15

*Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*,
    684 F.3d 462 (4th Cir.2012) ....................................................................... 5, 6

*Kentucky v. Graham*,
    473 U.S. 159 (1985) ...................................................................................... 11

*Koffman v. Garnett*,
    265 Va. 12; 574 S.E.2d 258 (2003) ................................................................ 24

*Leutwyler v. Office*,
    184 F. Supp. 2d 277 (S.D.N.Y 2001) ............................................................. 12

*Levine v. McLesket*,
    881 F. Supp. 1030 (E.D. Va. 1995) ............................................................... 27

*Lewis v. Mutond*,
    918 F.3d 142 (D.C. Cir. 2019) ................................................................ 15, 16

*Museum of Fine Arts v. Csepel*,
    143 S. Ct. 630 (2023) ................................................................................... 18

*Nat'l Review, Inc. v. Mann*,
    140 S. Ct 344 (2019) .................................................................................... 20

*Neitzke v. Williams*,
    490 U.S. 319 (1989) ....................................................................................... 5

*New York Times v. Sullivan*,
    376 U.S. 254 (1964) ..................................................................................... 18

*Odhiambo v. Republic of Kenya*,
    930 F. Supp. 2d 17 (D.D.C. 2013), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014) ................ 11, 16

*Peanut Corp. of America v. Hollywood Brands, Inc.*,
    696 F.2d 311 (4th Cir.1982) ............................................................... 6

*Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.*,
    257 Va. 315; 512 S.E.2d 560 (1999) ................................................. 6

*Rannoch, Inc. v. Rannoch Corp.*,
    52 F. Supp. 2d 681 (1999) ............................................................ 6, 6

*Republic of Philippines v. Pimentel*,
    553 U.S. 851 (2008) ........................................................................ 17

*Reuber v. Food Chemicals News, Inc.*,
    925 F.2d 703 (4th Cir. 1991) .......................................................... 21

*Ricaud v. American Metal Co.*,
    246 U.S. 304 (1918) ........................................................................ 16

*Richmond, Fredericksburg & Potomac R.R. v. Forst*,
    4 F.3d 244 (4th Cir.1993) .................................................................. 6

*Robinson v. Egnor*,
    699 F. Supp. 1207 (E.D.Va. 1988) ................................................... 7

*Russo v. White*,
    241 Va. 23; 400 S.E.2d 160 (1991) ................................................ 27

*Samantar v. Yousuf*,
    560 U.S. 305 (2010) ........................................................ 11, 13, 14, 15

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) .......................................................................... 5

*TELCO Communications v. An Apple A Day*,
    977 F. Supp. 404 (E.D. Va. 1997) ..................................................... 9

*Turner v. Commonwealth*,
    67 Va. App. 46; 792 S.E. 2d 299 (2016) ........................................ 24

*UMG Recordings, Inc. v. Kurbanov*,
    963 F.3d 344 (4th Cir. 2020) ........................................................ 6, 10

*United States v. Bly*,
    510 F.3d 453 (4th Cir. 2007) .......................................................... 24

iv

*Virginia v. Black*,
        538 U.S. 343 (2003)..................................................................................................... 24

*W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Int'l*,
        493 U.S. 400 (1990)................................................................................................ 16, 17

*West v. Multibanco Comermex*,
        807 F.2d 820 (9th Cir. 1987) ..................................................................................... 16

*Womack v. Eldridge*,
        215 Va. 338; 210 S.E. 2d 145 (1974) ........................................................................ 26

*Young v. New Haven Advocate*,
        315 F.3d 256 (4th Cir. 2002) ...................................................................................... 10

*Yousuf v. Samantar*,
        699 F.3d 763 (4th Cir. 2012) ................................................................................. 14, 14

*Zeran v. America Online, Inc.*,
        958 F. Supp. 1124 (E.D.Va. 1997) ............................................................................. 22

*Zippo Mfg. Co. v. Zippo Dot Com., Inc.*,
        952 F. Supp. 1119 (W.D. Pa.1997).............................................................................. 10

## STATUTES

28 U.S.C.
        § 1602........................................................................................................................... 11

Virginia
        Va. Code § 8.01-42.3 ........................................................................................ 22, 25, 25
        Va. Code § 8.01-328-1A.4........................................................................................... 7
        Va. Code § 18.2-60 ...................................................................................................... 22

## FEDERAL RULES

Federal Rules of Civil Procedure
        Rule 8............................................................................................................................ 26
        Rule 12.......................................................................................................................... 4
        Rule 19.......................................................................................................................... 17

I.        **INTRODUCTION**

Plaintiff Shnyar Anwar Hassan ("Shnyar")[1] is a U. S. citizen who resides with her husband in Manassas, Virginia. Shnyar is a vocal advocate for women's rights in Kurdistan, Iraq, and works with local and international Non-Governmental Organizations ("NGOs") to fight domestic violence and corruption in Kurdistan. (Compl. ¶ 8). Defendant Masrour Barzani is the Prime Minister of Kurdistan, a semi-autonomous region which is part of Northern Iraq.

Defendant and his relatives (the "Barzanis") have long enjoyed the riches and trappings of power they have amassed for themselves as a leading clan in Kurdistan; they control commercial enterprises in Kurdistan valued at several billion dollars. (Compl. ¶ 11). Numerous journalists have reported that Defendant and the Barzanis have enriched themselves through bribes and corrupt government contracts and have exported the proceeds of their corruption to the United States and other countries. (Compl. ¶ 12). Defendant has invested the proceeds of that corruption in U.S. real estate, including the $10 million mansion he owns with family in McLean, Virginia, and the $18 million commercial property he owns in Miami, Florida. (Compl. ¶ 10).[2]

Defendant has a long and regrettable history of using violence and intimidation to silence his critics and individuals who expose his corruption. (Compl. ¶ 14-25). According to reports provided by human rights organizations, Defendant and the Barzanis have threatened journalists and activists and caused them to be imprisoned and in some cases killed. One example of the Barzani's silencing of journalists is the case of Sardasht Osman, a young Kurdish writer who published articles in *The Kurdistan Post*, an opposition platform based in Europe, that were critical

---

[1] Pronounced "Shin-yar."

[2] Among other properties, the Barzanis also reportedly own two mansions in Beverly Hills, California, one of which was recently on the market with a sales price of $30 million. (*See* Compl. ¶ 33).

of the rampant corruption of the Barzani family. (Compl. ¶¶ 15-18). Osman wrote an article that compared the Barzani's luxurious lifestyles with that of average Kurdish citizens. He subsequently was abducted by armed men and his body was later found dumped in a neighborhood in Mosul, Iraq. According to a recent investigative report by several international organizations, as reported by Voice of America, the Barzanis were involved in Osman's tragic death. (Compl. ¶ 17). The Committee to Protect Journalists reports that, since Osman's 2010 murder, at least 22 journalists have been killed in Iraq in connection with their work, eight of whom were killed in the Kurdistan region of Iraq. (Compl. ¶ 19).

It was in this environment that Defendant attempted to silence Shnyar's criticisms by publishing a scurrilous and false allegation of marital infidelity with the intention that religious extremists or supporters of the Barzani regime would harm or kill Shnyar. In December 2021, American journalist Zack Kopplin published an article in *The American Prospect* that described how Defendant and the Barzanis use real estate and other investments they held in shell companies controlled by cronies outside Iraq to conceal huge sums of money obtained from their corrupt activities in Kurdistan. In the article, Kopplin stated that Defendant has abused his power to attack, torture, and kill his critics, including by assassinating journalists. Kopplin disclosed that Defendant and his family purchased real estate in the United States with proceeds of their corruption including mansions in Virginia, Florida, and California. (Compl. ¶¶ 37-41).[3]

Shnyar re-posted links to the article on Twitter and Facebook and translated it into the Kurdish language so that people in the local Kurdish community in Northern Virginia and in

---

[3] Kopplin noted that his discovery of documents linking Defendant to the purchase of an $18 million commercial property in Miami constituted the *fourth* time Defendant and his family had been exposed to be hiding the proceeds of their corruption in the United States. (Compl. ¶ 38).

Kurdistan could understand what Defendant was doing. (Compl. ¶ 54). She also demanded an explanation from Defendant about the source of the money he used to purchase real estate in the United States. This led to public outrage about Defendant and his family in Kurdistan and elsewhere. *Id.*

In retaliation for Shnyar's exposure of Defendant's illicit activities – none of which involved his position with the KRG – he caused multiple news sources, including television, online posting, and other social media, all under his control, to publish a statement, issued in Kurdish by the Office of the Prime Minister of the KRG, which falsely and maliciously claimed that Shnyar and Kopplin were involved in an extramarital affair (the "Defamatory Threat"). (Compl. ¶¶ 55-56).[4] Although Defendant did not expressly name Shnyar or Kopplin in the statement, they were immediately identifiable, as he intended, from the information provided in the Defamatory Threat and recognized as the persons alleged to be having the extramarital affair. (Compl. ¶¶56; 59).

The malicious lie that Defendant caused to be published was more than an attempt to ruin Shnyar's reputation. As noted by *Kurdish Watch,* "[a]ccusations of infidelity of a married woman – in a deeply conservative society like Kurdistan's – isn't only a character assassination but a direct call for the killing of said woman." (Compl. ¶ 61).[5] Even though Kopplin had never

---

[4] Defendant argues in his Motion to Dismiss that the word he used in the Defamatory Threat has several meanings, including "communication," "relationship," or "addiction." (MTD at 1 n. 2, and 5). However, the statement Defendant published has only one meaning in the context used and this was understood as such by persons who viewed it. (Compl. ¶¶ 61-63).

[5] "Honor killings", the killing of women by family members or other persons when they "dishonor" their families through "sexually immoral" actions, have been perpetrated on women for sex outside of marriage, even in cases of rape or assault. Kurdistan has an unfortunate and well-known history of honor killings, and its frequency has been on the rise. (Compl. ¶ 65). Honor killings are also on the rise in the United States and, according to a study commissioned by the Department of Justice, there are 23 to 27 such murders in this country every year. (Compl. ¶ 67).

met Shnyar, and his organization had said so publicly, the deluge of salacious comments and online posts that resulted from the Defamatory Threat sought both to shame Shnyar and support Defendant's libelous statements (Compl. ¶ 62).

Defendant knows that Shnyar lives and works in Northern Virginia, (Compl. ¶¶ 77, 82, 87), and he intended that the Defamatory Threat would be received by Shnyar and the Kurdish community here. In case Shnyar somehow missed the seriousness of Defendant's intentions, he sent an agent to meet with her in Tysons Corner, Virginia, to offer compensation in exchange for her silence and threaten her again with physical harm if she continued to speak publicly about his corrupt activities. (Compl. ¶¶ 63-64).[6]

The consequences of Defendant's actions directed to a U.S. citizen living in the Eastern District of Virginia have been catastrophic for Shnyar. She lives in fear for her personal safety and reasonable apprehension of danger from religious extremists or individuals politically aligned with Defendant. As a direct result of Defendant's malicious lies and threats to her well-being, she has suffered, and continues to suffer, extreme emotional distress, humiliation, and embarrassment. (Compl. ¶¶ 68-70).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint, or a claim within a complaint, based on the complaint's "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Rule 8(a)(2) of the Federal Rules requires "a short and plain statement of the claim showing that the pleader is entitled to relief," so as to "'give the defendant

---

[6] In his Motion to Dismiss, Defendant renews his attempt to smear Shnyar by alluding to her "very open social life" which she supposedly "grandstands in social media." MTD at 7 n 3. This echoes the libel he directed at Shnyar with his Defamatory Threat. (Compl. ¶ 62). Defendant's continuing attempts to tarnish Shnyar's reputation—now taken up by his counsel—have no place in a Rule 12 motion filed with this Court.

fair notice of what the ... claim is and the grounds upon which it rests,'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (omission in original).

The Supreme Court has interpreted Rule 8(a)'s pleading standard as requiring that a complaint include enough facts for the claim to be "plausible on its face" and thereby "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555, 570 (citations omitted). The plausibility requirement is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility" that a defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

Because a motion to dismiss tests the sufficiency of a complaint without resolving factual disputes, a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir.2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir.2011)). Accordingly, "'Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations.'" *Twombly*, 550 U.S. at 555 (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)) (omission in original). A complaint may therefore survive a motion to dismiss "even if it appears 'that a recovery is very remote and unlikely.'" *Id*. (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

When reviewing a Rule 12 motion to dismiss, a district court will not consider the merits of affirmative defenses except "in the relatively rare circumstances where ... all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'" *Goodman v. Praxair, Inc.*,

494 F.3d 458, 464 (4th Cir.2007) (en banc) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir.1993) (alteration in original)).

## III.   ARGUMENT

### A.   The Complaint Properly Invokes this Court's *In Personam* Jurisdiction

To meet Defendant's challenge to this Court's *in personam* jurisdiction, Shnyar need only make a *prima facie* showing of a sufficient jurisdictional basis in her Complaint. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989); *Rannoch, Inc. v. Rannoch Corp.,* 52 F. Supp. 2d 681, 684 (1999) (Ellis, J.). In considering the issue, this Court must construe all relevant allegations in the light most favorable to Shnyar and draw the most favorable inferences for the existence of jurisdiction. *Kensington Volunteer Fire Dep't, Inc.*, 684 F.3d at 467 (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440).

The analysis requires a two-step process: *First*, this Court must determine whether Virginia's long-arm statute authorizes the exercise of personal jurisdiction. *Second,* if the statutory requirements are met, the Court must then determine whether the assertion of personal jurisdiction comports with the Due Process Clause. *See Blue Ridge Bank v. Veribanc,* 755 F.2d 371, 373 (4th Cir.1985); *Peanut Corp. of America v. Hollywood Brands, Inc.,* 696 F.2d 311, 313 (4th Cir.1982). *See also Rannoch, Inc.,* 52 F. Supp. 2d at 684.

The allegations of the Complaint amply satisfy both jurisdictional tests.

#### 1.   Virginia's Long Arm Statute

Virginia's long-arm statute extends personal jurisdiction over nonresident defendants to the fullest extent permitted by the Fourteenth Amendment's Due Process Clause. *See, e.g., UMG Recordings, Inc. v. Kurbanov,* 963 F.3d 344, 351 (4th Cir. 2020); *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293 (4th Cir. 2009); *Peninsula Cruise, Inc. v. New River*

*Yacht Sales, Inc.*, 512 S.E.2d 560 (Va. 1999). "Because Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause," the statutory and constitutional inquiries merge into one inquiry. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). Thus, this Court has jurisdiction over a nonresident person, like Defendant, if the exercise of such jurisdiction comports with constitutional due process.

Under Virginia's long-arm statute, a court may exercise personal jurisdiction over person, who acts directly or *through an agent*, as to a cause of action arising from the person's "[c]ausing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he … *engages in any [] persistent course of conduct* … in this Commonwealth." Va. Code § 8.01-328- 1A.4 (emphasis added). It is not necessary for the contacts with Virginia to be related to the cause of action alleged. *See, e.g., Robinson v. Egnor*, 699 F. Supp. 1207, 1211 (E.D.Va. 1988) (Ellis, J.).

Defendant has engaged in a persistent course of conduct in Virginia giving rise to this Court's *in personam* jurisdiction over him. He "regularly visits and stays in the United States and Northern Virginia" (Compl. ¶ 9);[7] "owns a large mansion in McLean, Virginia …which he visits when he is in the United States" (Compl. ¶ 10); and "holds a 'green card' and is a permanent U.S. resident" (Compl.¶ 9).[8] Additionally, during 2021-2022, an individual identified as "Person #1"

---

[7] Defendant argues that even frequent visits by him to Virginia would not constitute a persistent course of conduct if they were made in his "official capacity" and that Shnyar has some obligation to plead that they were not. MTD at 8. There is no such requirement but, in saying there is, Defendant ignores Shnyar's allegation that he acted against her "in his personal capacity and for reasons that are unrelated to his position with the Kurdish Regional Government ("KRG")." (Compl. ¶ 9). Shnyar further alleges in her Complaint that Defendant regularly visits and stays in … Northern Virginia" in the mansion he and his family own in McLean. (Compl. ¶¶ 9-10). These allegations, to be proven in discovery and at trial, and his targeting of a Virginia resident with an actionable threat of violence, is more than sufficient to make a *prima facie* showing that Defendant engaged in a persistent course of conduct in Virginia.

[8] As a Green Card holder, Defendant is a permanent resident alien and considered to be within the most favored category of aliens, possessing the right to reside permanently in the United States, to work here, and to apply for citizenship. *Demore v. Kim*, 538 U.S. 510, 515 (2003).

approached Shnyar *on behalf of Defendant* to warn her that he is angry about her online postings. (Compl. ¶ 63). Then, in October 2022, during a meeting in Tysons Corner, Person #1 cautioned Shnyar that she was in danger for having exposed Defendant's corruption and that he would "seek revenge and possibly kill her … and that being a U.S. citizen would not protect Shnyar." (Compl. ¶ 64).[9]

Defendant also used the television and online media he controls to maliciously defame Shnyar with the intention of damaging her reputation and inciting religious extremists and supporters to physically harm her in Northern Virginia where she lives. (Compl. ¶¶ 2, 52-53, 58, 68, 77, 82, & 87). Defendant used his control over various media to publish his Defamatory Threat against Shnyar through internet postings, television, and social media. (Compl. ¶¶ 52-56). He targeted Shnyar in Northern Virginia in retaliation for her efforts to expose his corruption. (Compl. ¶¶ 2, 4, 8, 77, 82 & 87). Defendant's intentional acts outside Virginia have caused Shnyar to suffer tortious injury in this Commonwealth.

Despite all this, Defendant somehow contends that "[t]he Complaint nowhere alleges that the Prime Minister or his Office directed electronic activity into Virginia. To the contrary, the Complaint alleges the exact <u>opposite</u> …" MTD at 11. He also claims that "the <u>only</u> allegations related to Virginia were ownership with others of a house and episodic business to the Commonwealth—none of which gives rise to the claims in this suit." MTD at 12. (emphasis in original). This selective reading of Shnyar's claims misstates both the allegations in the Complaint as well as the essence of Defendant's publication of threats against her.

Defendant's "persistent course of conduct" in this state, including his use of the internet

---

[9] The contacts required to establish *in personam* jurisdiction may be committed by Defendant himself *or by his agent.* Va. Code § 8.01-328-1A.4 (emphasis added).

and television to defame and threaten a resident of Northern Virginia, satisfies the jurisdictional requirements of Virginia law.

## 2.    Due Process—Minimum Contacts

As previously noted, this Court has jurisdiction over a nonresident defendant, like Defendant, if the exercise of such jurisdiction comports with constitutional due process.

In conducting a "minimum contacts" analysis of a defendant's use of the internet or social media, courts have found it helpful to employ a "sliding scale" test. At one end of the scale are active transactional activities (*e.g.,* entering contracts) and, on "the opposite end ... [are] situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction." *TELCO Communications v. An Apple A Day,* 977 F. Supp. 404, 406 (E.D. Va. 1997). The sliding scale test determines whether a "defendant purposefully availed itself of the privilege of conducting activities in the State." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712-13 (4th Cir. 2002).

Using the sliding scale, a court may exercise jurisdiction over an out-of-state defendant when he "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business *or other interactions* within the State, and (3) that the activity creates, in a person within the State, a potential cause of action." *ALS Scan, Inc.*, 293 F.3d at 714 (emphasis added). *See also Alexander v. Avenue,* 473 F.Supp.3d 551, 556-57 (E.D. Va. 2020).

Shnyar has alleged that Defendant used media sources in Kurdistan[10] to publicly

_____

[10] Defendant and his family control multiple news services in Kurdistan. Defendant controls *Kurdistan 24* television. The Barzanis also control a large array of social media accounts and employ robot networks to amplify their social media messaging. (Compl. ¶ 52).

disseminate his Defamatory Threat to a worldwide audience and, specifically, to the Kurdish community in Northern Virginia. (*see e.g.,* Compl. ¶¶ 2, 4, 53, 63 & 64). Kurds living in Northern Virginia receive their news about Kurdistan in Kurdish language through the news sources controlled by Defendant and his family. (Compl. ¶ 53). Defendant directed that the Defamatory Threat be published by means of these media to reach Shnyar in Northern Virginia where he knew she was working to expose his corruption. (Compl. ¶¶ 53, 55-56).

Courts determining personal jurisdiction based on internet activity and other media generally focus on "the nature and quality of activity that a defendant conducts over the Internet." *Bochan v. La Fontaine*, 68 F. Supp. 2d 692, 701 (E.D. Va. 1999) (Ellis, J.); *see also Barrett v. Catacombs Press,* 44 F. Supp. 2d 717, 724 (E.D. Pa.1999) (citing *Zippo Mfg. Co. v. Zippo Dot Com., Inc.,* 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)). Here, Defendant's actions show that he "manifested an intent" to target [his online posting and other media] content to "Virginia readers," including Shnyar, her husband, and others in the Northern Virginia Kurdish community, such that he should have "reasonably anticipated being haled into court in Virginia." *Young v. New Haven Advocate*, 315 F.3d 256, 264 (4th Cir. 2002).

Defendant's words were intended to intimidate Shnyar, silence her criticism of Defendant and his family, humiliate her in her community, and grant permission to extremists to physically harm her—all targeted at Shnyar and the Northern Virginia community in which she lives. Defendant's intentional and malicious actions against Shnyar, a U.S. citizen and resident of this judicial district, created a cause of action under Virginia law. *UMG Recordings* 963 F.3d at 353 ("the touchstone remains that an out-of-state person have engaged in some activity *purposefully directed* toward the forum state") (emphasis added); *Gilmore v. Jones*, 370 F. Supp. 3d 630, 653-54 (W.D. Va. 2019).

Shnyar has made a *prima facia* showing that Defendant has engaged in a "persistent course of conduct … in this Commonwealth" and that his contacts with Virginia satisfy the requirements of due process. This Court has *in personam* jurisdiction over Defendant.

**B.     The Complaint Properly Alleges this Court's Subject Matter Jurisdiction**

      **1.     The Foreign Sovereign Immunities Act Does Not Apply Because Defendant Is Sued in his Personal Capacity.**

The Foreign Sovereign Immunities Act ("FSIA") governs the immunity of foreign states and their agencies and instrumentalities from suit and from execution in federal and state courts. *See* 28 U.S.C. §§ 1602-1611. In *Samantar v. Yousuf*, 560 U.S. 305 (2010), the Supreme Court held that the FSIA does not apply to foreign officials, whose immunity "is properly governed by the common law." 560 U.S. at 325. *Samantar* recognized, however, that "some actions against an official *in his official capacity* should be treated as actions against the foreign state itself, as the state is the real party in interest." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)) (emphasis added). In arguing that the FSIA forecloses this suit, MTD at 12-17, Defendant appears to rely on this exception to *Samantar*'s holding.

As the quoted language makes clear, however, *Samantar*'s "real party in interest" exception applies only when an official is sued "in his official capacity." *Samantar*, 560 U.S. at 325; *see, e.g.*, *Edwards v. Fed. Govt. of Nigeria*, CV 18-11133-FDS, 2018 WL 6619741, at *3 (D. Mass. Dec. 18, 2018) (finding foreign state to be real party in interest when "the complaint identifies the officials only by their official titles and does not anywhere mention their names" and suit sought to recover debts owed by the government); *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 35 (D.D.C. 2013), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014) (finding foreign state to be real party in interest when action was for breach of contract, the only contract was with the foreign

state, and the plaintiff "sued the individual defendants in their official capacities"). In this case, by contrast, Shnyar has sued Defendant in his personal capacity.

Defendant argues that the Complaint is "substantively against the Office of the Prime Minister" because that office issued the press release. MTD at 14. But, as explained below, the fact that a person acts through his government office "does not cloak his unofficial actions with immunity." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997). Defendant has been sued in his personal capacity for defamation. Nothing in the Complaint makes his office the real party in interest.

The only authority Defendant cites to support his position is *Leutwyler v. Office of her Majesty Queen Rania Al Abdullah*, 184 F. Supp. 2d 277 (S.D.N.Y 2001),  MTD at 15, which said in a footnote that actions controlling how the Queen of Jordan's image was disseminated were official. *Id.* at 289 n.12. The district court in that case presumed (as many courts then did) that the FSIA applied to foreign officials whenever they acted in their official capacities. *Id.* at 287. In *Samantar*, however, the Supreme Court overturned that presumption and held that the FSIA does not apply to foreign officials, even when they act in their official capacities, unless the foreign state is the real party in interest (a question that *Leutwyler* simply did not address). After *Samantar*, the FSIA does not apply whenever an official *acts* in his official capacity; it applies only when an official is *sued* in his official capacity. That is not the case here.

## 2.     Defendant Is Not Immune Under *Barr v. Matteo*

Defendant claims that, as a government official, he enjoys absolute immunity from defamation suits under *Barr v. Matteo*, 360 U.S. 564 (1959). MTD at 17-18. But *Barr* involved a suit against a *U.S. government* official, and Defendant has cited no case in which such immunity has been extended to *foreign* government officials.

12

The plurality in *Barr* explained that it was necessary to weigh "the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of *officials of the Federal Government*" against "the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits brought on account of action taken in the exercise of their official responsibilities." *Id.* at 565 (emphasis added). In *Barr*, the Supreme Court extended immunity beyond executive officers of cabinet rank because "there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank *in the executive hierarchy*." *Id.* at 573 (emphasis added). As these passages make clear, the Court's holding in *Barr* is limited to U.S. government officials.

Defendant's reliance on *Butters v. Vance Int'l, Inc.*, 225 F.3d 462 (4th Cir. 2000), is triply misplaced. First, *Butters* did not apply *Barr* to the contractors of foreign sovereigns, as Defendant claims. *Butters* simply cited *Barr* along the way to holding that contractors of foreign governments may be entitled to derivative foreign sovereign immunity. *Id.* at 466. Second, it is questionable whether *Butters* remains good law following the Supreme Court's decision in *Samantar*. *See Broidy Capital Mgt. LLC v. Muzin*, 12 F.4th 789, 802 (D.C. Cir. 2021) (noting that "[t]he Supreme Court foreclosed [*Butters*'s] approach in *Samantar*"). Third, the contractor in *Butters* was a U.S. corporation, whereas Defendant here is a foreign government official who (as explained above) is not entitled to immunity under *Barr*.

### 3.    Defendant Is Not Entitled to Common Law Immunity

As noted above, the Supreme Court held in *Samantar* that the immunity of foreign government officials "is properly governed by the common law." 560 U.S. at 325. On remand in *Samantar*, the Fourth Circuit distinguished between two kinds of foreign official immunity under

13

federal common law. *Yousuf v. Samantar*, 699 F.3d 763, 768-69 (4th Cir. 2012). "Head of state" immunity is status-based and grants absolute immunity to foreign heads of state, heads of government, and foreign ministers, but only during their tenures in office. *See Cengiz v. Salman*, CV 20-3009 (JDB), 2022 WL 17475400, at *4 (D.D.C. Dec. 6, 2022) ("Under customary international law, foreign heads of state, heads of government, and foreign ministers are traditionally entitled to status-based immunity from civil suit in other countries while they remain in office."); *see also* William S. Dodge & Chimène I. Keitner, *A Roadmap for Foreign Official Immunity Cases in U.S. Courts*, 90 Fordham L. Rev. 677, 696-98 (2021). Kurdistan is not a foreign state but rather a part of Iraq. The Prime Minister of Kurdistan does not, therefore, hold one of the three offices that would entitle him to head of state immunity.

The other kind of foreign official immunity is conduct-based and "extends to an individual for acts taken in his official capacity." *Samantar*, 560 U.S. at 322; *see also Yousuf*, 699 F.3d at 774 ("With respect to conduct-based immunity, foreign officials are immune from 'claims arising out of their official acts while in office.'") (quoting *Restatement (Third) of Foreign Relations Law* § 464, reporters' note 14 (Am. L. Inst. 1987)); Dodge & Keitner, *supra*, at 700-09. The Fourth Circuit on remand in *Yousuf* also relied upon Section 66(f) of the *Restatement (Second) of Foreign Relations Law*, which states a foreign official is immune from suit "with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Yousuf*, 699 F.3d at 774. Defendant is not entitled to conduct-based immunity because his defamatory press release is not an act performed in his official capacity and because the effect of exercising jurisdiction would not be to enforce a rule of law against Kurdistan or Iraq.

Defendant argues that the press release was an official act simply because it was issued by his government office. MTD at 18. But a foreign official cannot immunize private conduct from

suit by laundering it through his government office. In *Jungquist*, the D.C. Circuit held that a member of the royal family in Abu Dhabi was not immune from suit based on a private promise to pay the medical expenses of a boating accident victim even though the expenses were paid through a government program. The district court found a "corrupt bargain" in which the defendant promised to pay medical expenses in exchange for the victim's family's agreement to conceal information about the accident from the government of Abu Dhabi. 115 F.3d at 1028. "[I]t follows," the D.C. Circuit reasoned, "that Sheikh Sultan's promise to the Jungquists was, as the district court found, not in furtherance of the interests of the sovereign but a personal and private action." *Id.* "The fact that there was some convergence between Sheikh Sultan's official and unofficial conduct does not cloak his unofficial actions with immunity …." *Id.*[11] Similarly, in the present case, Defendant's actions to defame Shnyar in retaliation for her work to expose his corruption are "personal and private" actions. *Id.* The fact that Defendant acted through his office "does not cloak his unofficial actions with immunity." *Id.*

Even if the press release were considered an act taken in Defendant's official capacity, the effect of exercising jurisdiction would not be to enforce a rule of law against a foreign state. Defendant asserts that this requirement is met "because Plaintiff's claims chill a foreign government's ability to communicate with its citizens—a core governmental function." But the D.C. Circuit has held that this requirement is met only "when a judgment against the official would bind (or be enforceable against) the foreign state." *Lewis v. Mutond*, 918 F.3d 142, 146 (D.C. Cir. 2019). That was true in the only case that Defendant cites to support his claim of common law

---

[11] Under D.C. Circuit precedent when *Jungquist* was decided, the FSIA applied to foreign officials who acted in an official capacity. *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996). Although *Samantar* held that the FSIA does not apply to foreign officials, *Samantar*, 560 U.S. at 325, pre-*Samantar* cases addressing when actions are taken in an official capacity remain relevant for applying conduct-based immunity under federal common law.

immunity. *See Odhiambo*, 930 F. Supp. 2d at 35 ("Odhiambo has sued the individual defendants in their official capacities. And any damages that Odhiambo recovers in this suit will be payable by the Kenyan government and not from the individual defendants' 'own pockets.'" (citations omitted)). It is not true in this case, where Shnyar has sued Defendant in his private capacity and any judgment would not bind either Kurdistan or Iraq. *See Lewis*, 918 F.3d at 147 ("In cases like this one, in which the plaintiff pursues an individual-capacity claim seeking relief against an official in a personal capacity, exercising jurisdiction does not enforce a rule against the foreign state. Defendants are thus not entitled to the conduct-based foreign official immunity.").

### 4.     The Act of State Doctrine Does Not Bar Plaintiff's Claims

Defendant mischaracterizes the act of state doctrine as "a 'combination justiciability and abstention rule' designed to minimize the likelihood that federal courts will become embroiled in the domestic affairs of a foreign government," relying on a thirty-five-year-old Ninth Circuit decision. MTD at 19 (quoting *West v. Multibanco Comermex, S.A*, 807 F.2d 820, 827 (9th Cir. 1987)). The Supreme Court, however, has more recently clarified that "[t]he act of state doctrine is not some vague doctrine of abstention but a '*principle of decision* binding on federal and state courts alike.'" *W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 427 (1964)). *Kirkpatrick* held that the act of state doctrine applies only when a suit "requires the Court to declare invalid, and thus ineffective as 'a rule of decision for the courts of this country,' the official act of a foreign sovereign." *Id.* at 405 (quoting *Ricaud v. American Metal Co.*, 246 U.S. 304, 310 (1918)).

The act of state doctrine does not apply here for two reasons. *First,* it is not clear that a press release qualifies as a foreign act of state. *Kirkpatrick* holds that the doctrine applies only to acts that could constitute "a rule of decision," *id.*, and it is not clear how a press release could operate as a rule of decision. *Second,* even assuming that the press release qualifies as an act of

16

state, none of Shnyar's claims would require this Court to declare the press release "invalid." *Id.* In *Kirkpatrick*, the plaintiff alleged that the defendants bribed Nigerian officials to award a construction contract. The defendants argued that proving bribery would show that the contract was invalid. But the Supreme Court rejected the act of state doctrine defense because the validity of the contract itself was not something that the court would have to decide. *Id.* at 406. In this case, Shnyar alleges that the press release was defamatory, not that it was "invalid." The "validity" of the release is simply not something that this court will need to decide. *See also Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 144 (2d Cir. 2022) (noting that the question whether an act is valid is "separate from" the question whether the same act violates U.S. antitrust law).

### C.      The Kurdistan Regional Government Is Not an Indispensable Party[12]

Defendant argues that this case must be dismissed because the KRG is an indispensable party and cannot be joined because it is immune from suit under the FSIA. MTD at 20-22. Under Federal Rule 19, a party is required to be joined if it "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may … as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(b)(i). In *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), the Supreme Court held that an action to determine ownership of assets stolen by former Philippine President Ferdinand Marcos could not proceed without the Philippines as a party because the Philippines claimed ownership of the same assets.

Defendant argues that "[t]he KRG is a required party because this action threatens to impair its interest in communicating with its people." MTD at 21. That interest is nothing like the interest of the Philippines in *Pimentel*. In *Pimentel*, a decision regarding ownership of the disputed asset

---

[12] Accordingly, Defendant's Motion to Strike Jury has no basis and should be denied.

would have effectively foreclosed the Philippines from asserting its own claim to the same assets. In this case, finding the Defendant personally liable for defamation and the other causes of action alleged in the Complaint would in no way prevent the KRG from communicating with its own people. To be sure, a finding of defamation might discourage Defendant from further acts of defamation. But Defendant is not the KRG and cannot simply proclaim, like Louis XIV, "L'État c'est moi."

Moreover, even if the KRG were considered a required party, Rule 19(b) still allows an action to proceed if the foreign state's interests can be protected by the defendant. In a recent case, the D.C. Circuit held that a claim under the FSIA for property expropriated by Hungary could go forward, despite Hungary's immunity, because an instrumentality of the Hungarian government that was not immune from suit would adequately represent Hungary's interests. *De Csepel v. Republic of Hungary*, 27 F.4th 736 (D.C. Cir. 2022), *cert. denied sub nom. Museum of Fine Arts v. Csepel*, 143 S. Ct. 630 (2023). In this case, Defendant's interests are aligned with the asserted interests of the KRG, and there seems little doubt that he will adequately represent them.

### D.     Counts I-IV Are Sufficiently Pled

Defendant's arguments that Shnyar has failed to state a claim presume that the First Amendment requirements set forth in *New York Times v. Sullivan*, 376 U.S. 254 (1964), apply to this case. MTD at 22-29. But, as the Supreme Court recently noted, "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2019). In that case, the Court specifically held that "foreign organizations operating abroad … possess no rights under the First Amendment." *Id.* at 2087. Neither does Defendant here.

18

But even if this Court were to apply the requirements of *New York Times v. Sullivan*, Shnyar has sufficiently pled Counts I-IV.

### 1.   Count III (Defamation): Plaintiff is Not a Public Figure Under *New York Times v. Sullivan*

Defendant argues that the Complaint must be dismissed because Shnyar is a public figure and failed to allege the heightened standard of actual malice under *New York Times v. Sullivan*. Flipping the rationale behind *Sullivan* and the facts of this case on their heads, Defendant wraps himself in the flag of freedom of expression, the need for robust and uninhibited debate on important political and social issues, and the need for citizens to speak freely about the most important issues of the day without fear of suit. MTD at 23. Defendant, a very powerful, wealthy, and well-known figure, seems to suggest that his false allegation that Shnyar engaged in an extramarital affair with the reporter who exposed his corruption is the kind of authority-challenging expression worthy of protection under the United States Constitution. In fact, Defendant is the power to whom Shnyar speaks truth, and he deserves no protection under our law for his cowardly attack aimed at intimidating Shnyar and suppressing her freedom of speech.

As Defendant notes, *Fitzgerald v. Penthouse Int'l, Ltd.,* 691 F.2d 666 (4th Cir. 1983), sets out the Fourth Circuit's

> five requirements for a limited purpose public figure as: (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation.

*Id.* at 668. However, applying these criteria, Shnyar is not a "public figure" for defamation purposes and should not be held to the heightened actual malice standard. Defendant argues that she had access to channels of effective communication because the Complaint states that she uses her social media platform, provides interviews, and writes articles speaking out on issues

concerning women and activists and journalists in Iraq and Kurdistan. But the plaintiff in *Fitzgerald* had "continuous access to the media," lectured publicly, published several articles, reports, and brochures, appeared on 60 Minutes, and was interviewed for a *Newsday* article. *Id* at 669. By contrast, Shnyar has no access to the media, especially in Kurdistan, to combat Defendant's widely disseminated defamatory and dangerous statement. If posting on Facebook and Instagram makes one a public figure, there are few adult Americans today who would not meet that heightened test.

Defendant also claims that Shnyar "voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy" by promoting political causes in Kurdistan. MTD at 24-25. To start, the "controversy" raised by Defendant's Defamatory Threat had nothing to do with the "controversy" on which Shnyar opined. The "controversy" in *Fitzgerald* was an "ongoing public controversy" about the military's use of dolphins. *Fitzgerald*, 691 F.2d at 668. The alleged defamatory statement criticized Fitzgerald for trying "to make some fast bucks" by selling that technology to other countries. *Id*. at 670. In contrast, the controversy here is the exposure of Defendant's corruption, and not Shnyar's marital fidelity. Defendant's Defamatory Threat did nothing to refute the substance of the article that Shnyar reposted. It merely created a new "controversy" in which Shnyar had no role but victim. Her criticism of Defendant's kleptocracy did not justify accusing her of adultery in the interest of "robust and uninhibited debate on important political and social issues." MTD at 23 (quoting *Nat'l Review, Inc. v. Mann*, 140 S. Ct 344, 346 (2019) (Alito, J., dissenting from denial of certiorari)).

The same is true of the fourth *Fitzgerald* factor – whether the controversy existed prior to the publication of the defamatory statements. Certainly, the controversy of Defendant's corruption

predated his Defamatory Threat, but the controversy here—Shnyar's marital fidelity—is one of Defendant's making and did not predate his statement.

Having had no public figure status in the first place, Shnyar had no such status to retain at the time of Defendant's defamation. Thus, the fifth *Fitzgerald* factor also fails. This can hardly be seen as "hard blows" being swapped in the search for "just outcomes," as Defendant suggests. MTD at 25 (citing *Reuber v. Food Chemicals News, Inc.,* 925 F.2d 703 (4th Cir. 1991) (news organization published an employer's reprimand of a scientist who criticized a pesticide as being carcinogenic)).

Even if Shnyar were deemed to be a public figure, the Complaint sufficiently alleges that Defendant acted with actual malice in issuing his defamatory statement—that is, he acted "with knowledge of its falsity or reckless disregard of whether it was false." *Fitzgerald*, 691 F.2d at 670 (citing *Sullivan*, 376 U.S. at 279-80). Although falsely accusing a married woman of adultery to intimidate her and leave her vulnerable to being injured or murdered should satisfy an actual malice standard on its face, the Complaint is replete with references where that is clearly alleged. *See, e.g.,* Compl. ¶ 1 ("malicious and defamatory threats"), ¶ 4 ("Masrour knew and intended that his false and defamatory statements would irreparably damage Shnyar's reputation."), ¶ 56 ("The Defamatory Threat was issued at Masrour's direction and falsely and maliciously claimed that Shnyar and Kopplin … were having an extramarital affair), ¶ 58 (Masrour knowingly published or caused to be published, the Defamatory Threat …."),¶ 78 ("Masrour knew when he published, or caused to be published, the Defamatory Threat that it was maliciously false and defamatory to Plaintiff Shnyar."), ¶¶ 87-88 ("Defendant Masrour knowingly and intentionally published … the Defamatory Threat … [which] contained false and defamatory statements about Shnyar that

Defendant Masrour knew were untrue ….”), & ¶ 94 (“Defendant Masrour’s actions show willful, wanton, or reckless conduct and conscious disregard for Plaintiff ….”).

At a minimum, Shnyar should be permitted to proceed to discovery to determine the source of Defendant’s information because “[r]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.” *Fitzgerald*, 691 F.2d at 670 (citation omitted). In the unlikely event that Defendant’s accusation of adultery was not made up out of whole cloth, Shnyar should be permitted to discover the source of his information, whether that source was reliable, and what, if any, efforts Defendant made to verify the information before publishing it to the world.[13]

### 2.    Counts I (Assault) and II (Stalking) State Actionable Causes of Action

Defendant erroneously asserts that Counts I (Assault) and II (Stalking) are improperly pled because they are attempts “to avoid the strictures of defamation law by disguising a defamation claim as another tort. MTD at 26.[14] Here, too, Defendant is mistaken—both counts state cognizable claims under Virginia law.[15]

---

[13] Defendant’s statement asserts that “After we conducted our investigation, it became evident that the reporter has a relationship with [Plaintiff].” Compl. ¶ 56. Discovery will provide information about the nature of that alleged “investigation” and who conducted it.

[14] In support of his contention, Defendant erroneously cites *Zeran v. America Online, Inc.,* 958 F. Supp. 1124 (E.D. Va. 1997) (Ellis, J.). In *Zeran,* this Court held that an internet provider’s liability for distributing defamatory material is merely a type of liability for publishing defamatory material. The case did not involve causes of action, like the ones presented here, requiring proof of different elements.

[15] Defendant asserts that the “anti-stalking statute referenced as the basis for two of [Shnyar’s] claims in Counts I and II, provides no private right of action.” MTD at 28. This misconstrues the causes of action averred in the Complaint. Count I (Assault) is based on common law principles. Count II is a statutory claim brought pursuant to Va. Code § 8.01-42.3. The reference in Count I to Va. Code § 18.2-60 is merely descriptive to inform the Court that the Virginia legislature recognized that such conduct is so serious that it exposes a party to criminal penalties, as well as to the civil penalties requested here.

In Count III, Shnyar alleges that Defendant maliciously caused the publication of false statements that are defamatory *per se* and are part of his information campaign to silence her disclosures of his corruption. In contrast, Counts I and II allege separate causes of action arising from Defendant's efforts to incite religious extremists and his supporters to kill or do bodily to Shnyar. *See* Compl. ¶¶ 71-85. Although all three counts are based on the Defamatory Threat, they each require proof of different elements and seek redress for distinct aspects of Defendant's tortious conduct.

Defendant also claims, again incorrectly, that Shnyar should not be allowed to "repackage" her defamation claim as other counts because "words *alone* are never sufficient to constitute an assault." In Count I, Shnyar alleges that Defendant knowingly and intentionally assaulted her by publishing a Defamatory Threat he intended to incite religious extremists and individuals politically aligned with him to kill or do bodily harm to Shnyar. This threat involved much more than "words alone." It was a direction by Defendant to individuals in the Kurdish community in Northern Virginia and elsewhere to take action against Shnyar for having an extramarital affair.

Although contemporary American culture may be more accepting of marital infidelity than some cultures, it is considered so offensive by the standards of ultra-conservative adherents of Islam and in Kurdish culture that the merest hint of improper sexual conduct by a woman has resulted in a tragic number of "honor killings" throughout the world. It is no accident that Defendant made his accusation of infidelity the way he did—he intended to both smear Shnyar's reputation and put a bull's eye on her back for the purpose of silencing her, one way or the other. This was a call to action by Defendant and understood as such by individuals he sought to incite. (Compl. ¶ 62). And, to avoid any misunderstanding of his intentions, Defendant directed Person #1 to warn Shnyar to take the threats seriously. (Compl. ¶¶ 63-64).

To prove assault, a plaintiff must show that the defendant "performed 'an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in the other person's mind a reasonable apprehension of an imminent battery.' There is no requirement that the victim of such acts be physically touched." *Etherton v. Doe,* 597 S.E.2d 87, 89 (Va. 2004) (quoting *Koffman v. Garnett,* 574 S.E.2d 258, 261 (Va. 2003)); *see also Carter v. Commonwealth,* 606 S.E. 2d 839, 841 (Va. 2005) (an assault "whether a crime or a tort, occurs when an assailant engages in an overt act intended to inflict bodily harm and has the present ability to inflict such harm or engages in an overt act intended to place the victim in fear of apprehension of bodily harm and creates such reasonable fear or apprehension in the victim.").

Although words alone are insufficient to constitute an assault, they are never spoken in a vacuum. Words cannot be divorced from the accompanying circumstances and may be "highly relevant under the tort law definition of assault to determining whether the 'fear or apprehension in the victim' was 'reasonable.'" *Blankenship v. Commonwealth*, 838 S.E. 2d 568, 621 (Va. Ct. App. 2020). "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Turner v. Commonwealth,* 792 S.E. 2d 299, 304 (Va. Ct. App. 2016) (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003)). Under the test adopted by the Fourth Circuit, whether a communication contains a "true threat" turns on the reaction of a reasonable recipient familiar with the context of the communication. *United States* v. *Bly*, 510 F.3d 453, 458–59 (4th Cir. 2007).

The stalking cause of action in Count II also arises from the Defamation Threat. However, Count II, like the assault pled in Count I, requires proof of elements that are different from those

required by Count III (Defamation). In Count II, Shnyar alleges a civil cause of action against

Defendant for stalking in violation of Va. Code § 8.01-42.3,[16] which provides that:

> A victim has a civil cause of action against an individual who engaged in conduct
> that is prohibited under § 18.2-60.3, whether or not the individual has been charged
> or convicted for the alleged violation, for the compensatory damages incurred by
> the victim as a result of that conduct, in addition to the costs for bringing the action.
> If compensatory damages are awarded, a victim may also be awarded punitive
> damages.

Section 18.2-60.3 states in pertinent part that:

> Any person … who on more than one occasion engages in conduct, either in person
> or by other means, including … an electronically transmitted communication,
> directed at another person with the intent to place or when he knows or reasonable
> should know that the conduct places that other person at whom the conduct is
> directed places that other person in reasonable fear of death … or bodily injury …
> is guilty of a Class 1 misdemeanor."

Defendant erroneously states that Virginia's anti-stalking statute is a criminal statute that

does not create a private right of action. MTD at 28. This is incorrect. As indicated above, Virginia

Code § 8.01-42.3 expressly provides for a civil cause of action against an individual who engages

in stalking in violation of § 18.2-60.3. Count II's stalking cause of action requires proof that

Defendant engaged in such conduct "on more than one occasion." The Complaint complies with

that pleading requirement.[17]

---

[16] Due to a typographical error, § 8.01-42.3 is referred to in Count II as "§ 18.2-42.3."

[17] Shnyar alleges in her Complaint that Defendant "knowingly published, or caused to be
published, the Defamatory Threat to a worldwide audience on *multiple occasions* beginning
December 9, 2021, and continuing thereafter through and by the following means: (a) the Office
of the Prime Minister; (b) the websites of Rudaw; (c) the websites of K24; (d) Kurdistan TV;
Rudaw television; (f) K24 television; (g) numerous social media accounts maintained by the
KRG and KDP; and (h) networks of accounts and botnets linked to the KDP." (Compl. ¶ 58)
(emphasis added). She further alleges that Defendant "directed and promoted *multiple
communications* of the Defamatory Threat against [her] to a worldwide audience, including
individuals in Northern Virginia where he knew and understood she resides." (Compl. ¶ 82)
(emphasis added).

### 3. Count IV States an Actionable Cause of Action for Intentional Infliction of Emotional Distress

Defendant contends that Shnyar's Complaint falls short of the pleading standards required to state a claim for relief for intentional infliction of emotional distress ("IIED"), citing *Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E. 2d 145 (1974). Defendant is incorrect. In this Circuit, the more relaxed pleading standard of Fed. R. Civ. P. 8 ". . . trumps Virginia's heighted pleading standards for [IIED] claims in federal cases governed by state law." *Daniczek v. Spencer*, 156 F.Supp.3d 739. 758 (2016), *citing Hatfill v. New York Times Co.,* 416 F.3d 320, 337 (4th Cir. 2005).[18] Shnyar's Complaint more than meets Rule 8's pleading standards.

Defendant apparently concedes that Shnyar has pled sufficient facts to support three of the four elements of an IIED claim: Defendant intentionally and recklessly issued the Defamatory Threat and caused Shnyar to suffer emotional distress. *See Almy v. Grisham*, 639 S.E.2d 182, 186 (Va. 2007). Defendant also concedes that his conduct in publishing the false accusation of adultery and failing to retract his lie was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency …." *Id.* at 187. By any measure, Defendant's conduct indeed was outrageous and intolerable. Even more so when evaluated in the context of the controlling norms of conservative Kurdish society.

Defendant misunderstands the pleading requirements in this Circuit. He argues that Shnyar was required to plead the details underlying the trauma she suffered and describe with specificity the efforts she may have taken to seek medical assistance and the physical manifestations of her emotional distress. MTD at 29. There is no requirement that a plaintiff plead such minutiae or in such specificity.

---

Defendant's reliance on *Levine v. McLesket*, 881 F. Supp. 1030, 1054 (E.D. Va. 1995) is similarly misplaced. MTD at 29. On summary judgment, the *Levine* Court determined that the plaintiff failed to demonstrate that calling her a "bitch" and suggesting that she was homosexual was anything more than "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities." The court further found that the plaintiff failed to demonstrate that that her emotional injury was so severe that a reasonable person could not be expected to endure it. *Id.* (citing *Russo v. White*, 400 S.E.2d 160, 163 (Va. 1991)).

Labeling a married Muslim woman an adulteress to a conservative Muslim community is a far cry from the situations in *Levine* and *Russo*, where the underlying claims involved "hang-up" telephone calls. Here, the impact of Defendant's conduct must be evaluated in the context of Kurdish society, where an extramarital affair can result in serious bodily harm or even death. The Complaint alleges that following Defendant's publication of his Defamatory Threat, Shnyar was subjected to shame, humiliation, threats, perpetual fear for her personal safety, and deprivation of her livelihood. Such an experience would cause even the most resilient among us to suffer severe, unrelenting emotional distress—as alleged in the Complaint. (Compl. ¶¶ 69-70, 95-96). The Complaint has provided Defendant "fair notice of what [Shnyar's] claim is and the grounds upon which it rests." *Hatfill*, 416 F.3d at 337. Shnyar has sufficiently supported the only element of her claim for intentional infliction of emotional distress that Defendant challenges, and her Complaint complies with the pleading requirements.

## IV.      CONCLUSION

For the foregoing reasons, Plaintiff Shnyar Anwar Hassan respectfully request that this

Court deny Defendant Masrour Barzani's Motion to Dismiss and Motion to Strike Jury.


Dated: February 24, 2023                    Respectfully submitted,

                                            SECIL Law PLLC


                                    By:   /s/ *John P. Rowley III*
                                          John P. Rowley III (VSB No. 19804)
                                          Adriaen M. Morse Jr. (VSB No. 38889)
                                          Janet DeCosta*
                                          1701 Pennsylvania Ave., NW, Suite 200
                                          Washington, D.C. 20006
                                          jrowley@secillaw.com
                                          (202) 417-8652
                                          amorse@secillaw.com
                                          (202) 417-8232


                                          E & W Law, LLC


                                    By: /s/  *John S. Irving*
                                          John S. Irving*
                                          1455 Pennsylvania Ave., NW, Suite 400
                                          Washington, D.C. 20004
                                          john.irving@earthandwatergroup.com
                                          (301) 807-5670

                                          *Pro hac vice applications pending*

                                          *Counsel for Plaintiff Shnyar Anwar Hassan*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of February 2023, I caused a copy of the foregoing to be filed electronically with the Clerk of Court using the CM/ECF system, which then sent a notice of filing (NEF) to all counsel of record.


Dated: February 24, 2023                          /s/ *John P. Rowley III*
                                                  John P. Rowley III

29